C. Open or ornamental fences and gates, measured from ground level along the full length of the fence, shall not exceed six feet (6') in height. The open area between vertical members of the fence or gate shall either be four inches (4") or less, or twelve inches (12") or greater.

D. Fences and gates not exceeding a height of ten feet (10'), measured from ground level along the full length of the fence, that are open mesh and screened as customarily required for tennis courts and other similar courts are permitted and may be equipped with the customary attached windbreaks. Fences and gates required for tennis and other similar courts shall meet setback requirements as set forth in §751 of this Ordinance.

E. No fence, gate or wall more than four feet (4') above the centerline grades of intersecting streets may be erected on any corner lot or along a driveway for a distance of thirty feet (30') measured along the street right-of-way lines from their point of junction.

F. All fence posts or gateposts and other structural supports shall be located on the interior side of the fence or gate, facing the property to be fenced. The finished side of the fence or gate shall face the adjoining property and/or right-of-way.

G. No fence, gate or wall shall be constructed within an easement in such a way that it would prevent the use of the easement for its intended purpose. The issuance of a permit should not impose any duty on the Borough to preserve an easement of which the Borough may not be aware. This duty shall be imposed on the property owner.

H. Walls that are attached to a building shall be regulated as, and considered, part of the building.

I. Fences, gates, and walls shall be constructed only of traditional materials, as defined by the definition of "Fence" under §302 of this Ordinance, that are normally used for the construction of fences, gates, and walls. Temporary and make-shift materials are prohibited. The Zoning Officer shall have the power to determine if the materials proposed to be used are unsuitable or unsafe.

J. All fences, gates and walls must be maintained in good condition. No advertising shall be permitted on any fence, gate or wall in the R-, S-, or IAC districts, and no advertising shall be permitted on any fence, gate or wall erected on residential property in C-, CM- or M-districts.

K. Fences, gates, walls, and the area between their exterior side and the nearest property line or roadway curb line or shoulder edge shall be properly maintained at all times. Broken, cracked, rotted, or rusted structural components shall be removed or repaired promptly. Grounds shall be kept clear or planted with vegetation appropriate to the site. A property owner who fails to provide proper maintenance may, after notice by the Zoning Officer and an opportunity to correct the situation, be required to remove the fence, gate or wall.

L. In all zone districts, the following fences, gates or walls are strictly prohibited:

1. Barbwire fences and gates or fence and gates using razor wire or any other material likely to cause physical injury to persons or animals. Fences and gates used for an agricultural operation, industrial/manufacturing facilities, or public facilities/utilities are exempt from this prohibition.

2. Fences, gates or walls erected in such a manner as to inhibit or divert the natural drainage flow or cause the blockage or damming of surface waters.

3. Fences, gates or walls that may create or enhance a fire hazard or other dangerous condition, or that may result in the obstruction to effectively fight a fire.

4.  Chain-link fences and gates having an unfinished or jagged top edge.

5.  Temporary fences, such as snow fences or expandable and collapsible fences, unless necessary for use on sites under construction or for snow control; canvas or cloth fences, except when necessary for the protection of shrubs and vegetation.

M.  A Zoning permit shall be required for the erection of all fences, gates and walls. The Zoning Officer shall have the duty and all power necessary to issue appropriate notices or orders directing property owners to correct any conditions that are in violation of this Ordinance.

N.  In the case of any fence, gate or wall erected before the effective date of this Ordinance, the requirements of this section shall apply upon the replacement of said fence or wall or any section(s) or components thereof comprising at least twenty-five percent (25%). Repairs, as this term is used in this Ordinance, shall not be interpreted to include painting.

O.  Retaining walls, as defined by this Ordinance and necessary to hold back slopes, are exempt from the regulations of this section.

## 729  **FLEA MARKET (Special Exception: CM-1, CM-2)**

A.  Indoor flea markets shall meet minimum parking requirements for retail businesses set forth in Article X.

B.  Outdoor flea markets not involving the use of a building or structure shall require a lease or letter of permission to occupy the property and operate the flea market, which shall be provided to the Borough with the Zoning Permit Application. The Borough may require commercial outdoor flea market operators and vendors to provide a bond or vendors fee to assure that the operation thereof is carried out in a safe and environmentally sound manner.

C.  Both indoor and outdoor flea markets shall be provided with an approved water supply and sewage disposal system.

D.  For both indoor and outdoor flea markets, a ten-foot-wide (10') evergreen buffer strip shall be provided along all side and rear yards that abut any R-district or any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

## 730  **FORESTRY (Permitted Use: All Zone Districts)**

A.  <u>Purpose.</u>

In order to conserve forested open space and the environmental and economic benefits they provide, it is the purpose of Olyphant Borough to encourage the owners of forestland to continue to use their land for forestry purposes, including the long-term production of timber, recreation, wildlife, and amenity values. The timber harvesting regulations contained in this §730 are intended to further this purpose by:

1.  Promoting good forest stewardship.

2.  Protecting the rights of adjoining property owners.

3.  Minimizing the potential for adverse environmental impacts.

4.  Avoiding unreasonable and unnecessary restrictions on the right to practice forestry.

– 73 –

B.   Applicability.

To encourage maintenance and management of forested or wooded open space and promote the conduct of forestry as a sound and economically viable use of forested land throughout Olyphant Borough, forestry activities, including timber harvesting, shall be subject to the requirements of this §730 where the value of the trees, logs, or other timber products removed exceeds $1,000. These provisions do not apply to the cutting of trees for the personal use of the forestland owner or for pre-commercial timber stand improvement.

C.   Permits/Fees, Notification of Completion, and Preparation of a Logging Plan.

1.   *Permits/Fees* — For all timber harvesting operations that are expected to exceed five (5) acres, the forestland owner shall obtain a Zoning Permit from the Zoning Officer at least forty-five (45) business days before the operation commences. The Borough Council may establish by Resolution a Schedule of Fees pertaining to timber harvesting operations. In addition, the forestland owner shall be responsible for any cost incurred by the Borough for review of the Logging Plan required under 3. below by the Zoning Officer and/or Borough Engineer. No timber harvesting shall occur until the permit has been issued.

2.   *Notification of Completion* — For all timber harvesting operations required to obtain a Zoning Permit, the forestland owner shall notify the Zoning Officer within thirty (30) business days before the operation is complete.

3.   *Logging Plan* — Every forestland owner on whose land timber harvesting is to occur shall prepare a written logging plan in the form specified by this ordinance. No timber harvesting shall occur until the plan has been prepared. The provisions of the plan shall be followed throughout the operation. The plan shall be available at the harvest site at all times during the operation and shall be provided to the Zoning Officer upon request.

4.   *Responsibility for Compliance* — The forestland owner and the operator shall be jointly and severally responsible for complying with the terms of the logging plan.

D.   Contents of the Logging Plan.

1.   *Minimum Requirements* — As a minimum, the logging plan shall include the following:

a.   Design, construction, maintenance, and retirement of the access system, including haul roads, skid trails, and landings.

b.   Design, construction, and maintenance of water control measures and structures such as culverts, broad-based dips, filter strips, and water bars.

c.   Design, construction, and maintenance of stream and wetland crossings.

d.   The general location of the proposed operation in relation to municipal and state highways, including any accesses to those highways.

2.   *Map* — Each logging plan shall include a sketch map or drawing containing the following information:

a.   Site location and boundaries, including both the boundaries of the property on which the timber harvesting will take place and the boundaries of the proposed harvest area within that property.

– 74 –

    b.    Significant topographic features related to potential environmental problems.

    c.    Location of all earth disturbance activities such as roads, landings, and water control measures and structures.

    d.    Location of all crossings of the waters of the Commonwealth.

    e.    The general location of the proposed operation to municipal and state highways, including any accesses to those highways.

3. *Compliance with State Law* — The logging plan shall address and comply with the requirements of all applicable state regulations including, but not limited to, the following:

    a.    Erosion and Sedimentation Control regulations contained in Title 25 Pennsylvania Code, Chapter 102, promulgated pursuant to the Clean Streams Law (35 PS §691.1 et seq).

    b.    Stream crossing and wetlands protection regulations contained in Title 25 Pennsylvania Code, Chapter 105, promulgated pursuant to the Dam Safety and Encroachments Act (32 PS §693.1 et seq).

4. *Relationships of State Laws, Regulations, and Permits to the Logging Plan* — Any permits required by state laws and regulations shall be attached to and become part of the logging plan. An erosion and sedimentation pollution control plan that satisfies the requirements of Title 25, Pennsylvania Code, Chapter 102, shall also satisfy the requirements for the logging plan and associated map specified in paragraphs A. and B. of this section, provided that all information required by these paragraphs is included or attached.

E.    <u>Forest Practices.</u>

The following requirements shall apply to all timber harvesting operations in the Borough:

1. Felling or skidding on or across any public thoroughfare is prohibited without the express written consent of the Borough or PennDOT, whichever is responsible for maintenance of the thoroughfare.

2. No tops or slash shall be left within twenty-five feet (25') of any public thoroughfare or private roadway providing access to adjoining residential property.

3. All tops and slash between twenty-five and fifty feet (25' and 50') from a public roadway or private roadway providing access to adjoining residential property or within fifty feet (50') of adjoining residential property shall be lopped to a maximum height of four feet (4') above the ground.

4. No tops or slash shall be left on or across the boundary of any property adjoining the operation without the consent of the owner thereof.

5. Litter resulting from a timber harvesting operation shall be removed from the site before it is vacated by the operator.

E.    <u>Responsibility for Road Maintenance and Repair and Road Bonding.</u>

Pursuant to Title 75 of the Pennsylvania Consolidated Statutes, Chapter 49, and Title 67 Pennsylvania Code, Chapter 189, the forestland owner and the operator shall be responsible for repairing any damage to Borough roads caused by traffic associated with the timber

– 75 –

harvesting operation to the extent the damage is in excess of that caused by normal traffic, and may be required to furnish a bond to guarantee the repair of such damages.

F.   Enforcement.

   1.   *Inspections* — The Zoning Officer may go upon the site of any timber harvesting operation before, during, or after active logging to (1) review the logging plan or any other required documents for compliance with this §730 and (2) inspect the operation for compliance with the logging plan and other on-site requirements of these regulations.

   2.   *Violation Notices, Suspensions, and Penalties* — Any timber harvesting operation found to be in violation of this Ordinance shall be subject to the penalty regulations set forth in §1209 of this Ordinance.

## 731   GARAGE OR YARD SALE (Permitted Accessory Use: R-1, R-2, S, C-1, C-2, CM-1, CM-2)

A permit shall be required for garage or yard sales or private rummage sales and shall be subject to the following specific regulations:

A.   Individual, private-family yard or garage sales are permitted as residential accessory uses. Each individual property location may have a maximum of two (2) yard sales during any one (1) calendar year. Each sale may last only one (1) day. The two annual sales may be either on consecutive or nonconsecutive days. Yards or garage sales are meant to allow individuals the offering for sale of accumulated normal household items, and the buying and selling of commercial or surplus material shall be considered a commercial operation and shall only be allowed in zone districts where retail sales of general merchandise is permitted.

B.   Private rummage sales conducted by a service, non-profit, religious or charitable organization are permitted as accessory uses and are exempt from the requirements listed above in §§A.

C.   No sale shall operate before 8 AM or after 7 PM on any day.

D.   Any sign, notice, or advertisement for the sale shall be removed immediately upon conclusion of the sale.

## 732   GROUP HOME OR HALFWAY HOUSE (Permitted Use: R-1, R-2, S)

A.   There shall be supervision provided by an appropriate number of persons trained in the field for which the group home is intended, as required by the Uniform Construction Code and other applicable state regulations.

B.   The use shall be licensed or certified under an applicable state or federal program for group housing. A copy of any such license or certification shall be filed with the Zoning Officer.

C.   The use shall register the general type of treatment or care, maximum number of residents and sponsoring agency with the Zoning Officer. Such information shall be available to the public for review upon request.

D.   The group home or halfway house shall notify the Zoning Officer within fourteen (14) days if there is a change in the type of clients, the sponsoring agency, the maximum number of residents, or if any applicable license/certification is suspended or withdrawn.

E.   Any medical or counseling services provided shall be limited to residents.

F.   The maximum number of group home or halfway house residents, including resident staff, shall not exceed eight (8) individuals.

G.   No exterior signs shall identify the use.

H.   Construction of a group home or halfway house shall comply with minimum density and lot and yard regulations applicable to single-family dwellings set forth in Article VI of this Ordinance.

**733   GUEST HOUSE (Special Exception Accessory Use: R-1, R-2, S, CM-1, CM-2)**
      **POOL HOUSE (Permitted Accessory Use: R-1, R-2, S, C-1, C-2, CM-1, CM-2)**

A.   A guest house as defined by §302 of this Ordinance may only be approved, established, or constructed on parcels of one (1) acre or more.

B.   A guest house or pool house shall only contain one (1) story and shall not exceed five hundred (500) square feet of gross floor area.

C.   Unattached guest houses may only be located in a rear yard and shall be set back a minimum of ten feet (10') from rear and side property lines and shall not exceed a height of twenty-five feet (25').

D.   The exterior architectural appearance of a guest house shall be compatible to that of the principal residential structure.

E.   Pool houses may only be located in rear yards and shall be set back a minimum of five feet (5') from rear and side property lines and shall not exceed a height of fifteen feet (15').

**733A   HELIPAD/HELIPORT (Special Exception: S, IAC, CM-2)**

A.   All applicable state and federal regulations shall be met and copies of applicable permits and licenses shall be provided to the Borough Council.

B.   Minimum setbacks shall be set by the Zoning Hearing Board on an individual site basis dependent on specific safety requirements.

C.   The Zoning Hearing Board shall also consider the following:

   1.   The effect upon reasonable use of properties affected by the proposed helipad.

   2.   How the applicant plans to acquire any necessary air rights.

   3.   The character of the flying operations expected to be conducted at the helipad.

   4.   The provision of hazard lighting and markings.

   5.   The importance of aircraft safety.

D.   In the event of an emergency, parks, parking lots, or open fields within all zone districts of the Borough may be used as an emergency helicopter landing site. The above requirements of this section shall not apply in these circumstances.

**734   HOME-BASED BUSINESS, MINIMAL IMPACT (Special Exception Accessory Use: R-1, R-2, S, C-1, C-2, CM-1, CM-2)**

A.   The following uses shall not be permitted as a minimal impact home-based business: adult business, animal hospital, kennel or veterinarian clinic; commercial stable; funeral home or

mortuary; retail business; restaurant, café, or coffee house; auto repair or auto body shop; transit-related- or maintenance facility; wholesale business; or, warehousing and distribution.

B.    The Zoning Officer or Zoning Hearing Board may determine that other particular types or intensity of uses are unsuitable to be minimal impact home-based businesses or that the proposed lot area or setbacks are insufficient.

C.    The minimal impact home-based business shall be conducted completely indoors and may be within a principal dwelling or accessory structure. The total amount of floor area used for the minimal impact home-based business shall not be greater than twenty-five percent (25%) of the total floor area of the principal dwelling unit.

D.    Outdoor storage of materials, products, or equipment shall be prohibited.

E.    Display windows, business displays, or advertising visible from outside shall only be allowed in the C-districts. A personal sign identifying the minimal impact home-based business is permitted in all districts where allowed pursuant to the requirements of Article IX of this Ordinance.

F.    In R- and S-districts, if a commercial vehicle is utilized in conjunction with the minimal-impact home-based business, the use shall comply with the requirements of Commercial Vehicle Parking in R-districts and on Residential Property set forth in Article X of this Ordinance.

G.    No machinery or equipment shall be permitted that produces noise, noxious odor, vibration, glare, electrical interference or radio or electromagnetic interference beyond the boundary of the property. No use shall generate noise or glare in excess of what is typical in a residential neighborhood.

H.    The use shall comply with all performance standards and environmental protection standards set forth in Article VIII of this Ordinance.

I.    The use shall not routinely involve the parking of more than four (4) nonresident vehicles at any one time. The applicant shall prove to the satisfaction of the Zoning Hearing Board that the use will have adequate area for off-street parking and loading spaces.

J.    In R- and S-districts, the Zoning Hearing Board may regulate the location of needed off-street parking to maintain the residential character, and may deny a minimal impact home-based business if adequate off-street parking cannot be accommodated.

K.    In R- and S-districts, the exterior of the dwelling and lot shall not be changed in such a way to decrease its residential appearance, except for permitted parking spaces and a personal sign identifying the business.

L.    In R- and S-districts, a minimal impact home-based business shall not be conducted in a way that is perceptible from beyond the property boundaries and not between the hours of 8 PM and 8 AM. This time limit shall also apply to any loading or unloading of vehicles that causes noise to abutting properties.

M.    The use shall not involve the storage or use of hazardous, flammable, or explosive substances, other than types and amounts commonly found in a dwelling. The use shall not involve the storage or use of toxic substances.

N.    In addition to permanent residents, one (1) nonresident of the dwelling may work on the premises of a minimal impact home-based business.

O.  Child Day Centers operated as minimal impact home-based businesses shall also comply with the following:

1.  The number of children that care is provided to shall be from four (4) to six (6).

2.  Smoke detectors shall be provided throughout the building, an "ABC"-rated fire extinguisher shall be provided, lights shall be provided at all exits, and at least one (1) exit window shall be provided with an opening within six feet (6') of the exterior grade level.

3.  A minimum of one hundred (100) square feet of a safe, fenced-in exterior play area shall be provided. The play area shall not be within any front yard and shall be separated from any abutting residential property by a ten-foot-wide (10') evergreen buffer strip. The initial height of the evergreen planting shall be five feet (5').

4.  A state-issued Certificate of Occupancy must be provided.

## 735  <u>HOME-BASED BUSINESS, NO IMPACT</u> (Permitted Accessory Use: R-1, R-2, S, C-1, C-2, CM-1, CM-2)

A.  The no-impact home-based business shall be compatible with the residential use of the property and surrounding residential uses.

B.  The no-impact home-based business shall have no employees other than family members residing in the dwelling.

C.  There shall be no display or sale of retail goods and no stockpiling or inventory of a substantial nature.

D.  There shall be no outside appearance of a no-impact home-based business use, including, but not limited to, parking, signs, or lights.

E.  The use shall comply with the requirements of Commercial Vehicle Parking in R-districts and on Residential Property set forth in Article X of this Ordinance.

F.  The no-impact home-based business may not use any equipment or process that creates noise, vibration, glare, fumes, odors, or electrical or electronic interference, including interference with radio or television reception, which is detectable in the neighborhood.

G.  The no-impact home-based business may not generate any solid waste or sewage discharge in volume or type that is not normally associated with residential use in the neighborhood.

H.  The no-impact home-based business shall be conducted only within the dwelling and may not occupy more than twenty-five percent (25%) of the habitable floor area.

I.  The no-impact home-based business may not involve any illegal activity.

## 736  <u>HOSPITAL</u> (Special Exception: IAC, CM-2)

A.  A minimum of two acres (2) shall be required for a hospital.

B.  The use shall comply with all performance standards and environmental protection standards set forth in Article VIII of this Ordinance.

**737**  **HOTEL**-INTERIOR ROOM ACCESS (Permitted Use: C-2, IAC, CM-2)
**MOTEL**-EXTERIOR ROOM ACCESS (Permitted Use: IAC, CM-2)

A.  In the IAC and CM-2 zones, all structures must be setback a minimum of fifty feet (50') from all property lines.

B.  The use shall provide accommodations (rental units) for rooming or boarding casual and transient guests for a maximum stay of thirty (30) days.

C.  A ten-foot-wide (10') evergreen buffer strip shall be provided along all side and rear yards that abut any R-district or Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

**738**  **INDUSTRY, HEAVY** (Permitted Use: M-1, M-2, CM-2)
**INDUSTRY, LIGHT** (Permitted Use: M-1, M-2, CM-1, CM-2)

A.  All applicable performance standards as required under Article VIII of this Ordinance shall be met.

B.  All applicable Federal and/or state regulations shall be met. Copies of any required licenses and/or permits shall be provided to the Zoning Officer.

C.  A ten-foot-wide (10') evergreen buffer strip shall be provided along all side and rear yards that abut any R-district or Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

**739**  **JUNK YARD OR AUTOMOBILE WRECKING FACILITY** (Conditional Use: CM-2)

A.  All proposed junk yards or automobile wrecking facilities shall met all applicable performance standards as required under Section 809 of this Ordinance.

B.  All proposed junk yards or automobile wrecking facilities shall be completely screened from roads and developed areas with a solid fence or wall six feet (6') or more in height, maintained in good condition. Materials stored shall not be visible at any property line.

**740**  **MACHINE SHOP** (Permitted Use: M-1, M-2, CM-2)
**TIRE RE-TREADING AND RE-CAPPING** (Permitted Use: M-1, M-2, CM-2)

A.  All machine shops and tire re-treading and re-capping facilities, as defined by §302 of this Ordinance, shall comply with §738, subsections B. through E. of this Ordinance.

**741**  **MINERAL AND NATURAL RESOURCE EXTRACTION AND PROCESSING (excluding Oil and Gas)** (Special Exception: S, CM-2)

A.  The crushing, processing, excavation or any other operations associated with mineral extraction or processing shall be setback a minimum of one hundred (100') feet from road rights-of-way and lot boundaries and five hundred (500') feet from any existing residential use. Buffering, screening and fencing may be required for adjacent uses dependent upon specific site and adjacent use conditions.

B.  Excavating operations, including drilling, hauling, and blasting shall not be carried out on Sundays and shall not be operated earlier than 7:OO AM nor later than 6:OO PM during the remainder of the week.

C.  Evidence of compliance with all state and Federal laws applicable to the extraction and processing for which a permit is sought shall be provided to the Zoning Hearing Board.

D.   A description of the character, timing, and duration of the proposed operation, including maps and plans showing the area and extent of the proposed activity, the location and design of all structures, depth of the excavation, areas for storage of soil materials, and facilities for processing, loading and transportation of minerals shall be submitted.

E.   The location of all structures and land uses that may be affected by the proposed operation and measures that will be taken to protect all structures and land uses from adverse impacts from extraction shall be provided.

F.   Measures that will be taken to insure that any loss, diminution, or pollution of water supplies in areas affected by extraction will be corrected or replaced shall be provided.

G.   Measures that will be taken to insure that the performance standards contained in all sections of this ordinance shall be met shall be provided.

H.   Description of plans for the transportation of the extracted product, including routes of travel, number and weight of vehicles, and measures that will be taken to maintain all roads within the Borough that are used to transport minerals and to repair any damages that may result from the use of roads for loads and volumes of traffic shall be provided.

I.   Plans for the restoration and reclamation of all land affected by the extraction and processing operation to a condition that will support uses that are permitted in the zone district shall be provided.

J.   In deciding upon an initial application for a special exception for extraction or processing, the Zoning Hearing Board shall evaluate the impact of the proposed activity upon adjacent areas and shall approve granting of a permit only if it finds that:

   1.   The scale, pace, and duration of the proposed activity are reasonable in relationship to the ability of the adjacent area to maintain normal patterns of activity while extraction activities are ongoing.

   2.   Adequate safeguards are provided to insure that damage will not be done to the natural environment.

   3.   The proposed plan for reclamation and reuse of land is acceptable. If the proposed reclamation plan is for forestry or other undeveloped uses, grading, drainage, and vegetation must be compatible with other such use areas in the Borough. If the proposed reclamation is for development, the proposed development should be compatible with the regulations of the applicable zoning district.

K.   In deciding upon an application for any expansion or change in an extraction or processing application, the Zoning Hearing Board shall consider all of the factors listed above and in addition shall grant a Special Exception only if the following conditions are met:

   1.   The performance of the applicant to date has been in conformance with all of the agreements made at the time of the initial conditional use approval; and

   2.   No expansion in area of an extraction operation shall be permitted until extraction activities have been completed on an equivalent area of land and the land shall have been graded and vegetation established in accordance with the approved plan for reclamation of the site.

L.   In no case shall a special exception granted by the Zoning Hearing Board extend to an area of land or mode of operation that is larger or in any way different from the scope of permits

issued concurrently by state and/or federal permitting authorities for the same existing or proposed extraction or processing activity.

M.   Outdoor lighting, if any, shall be shielded and/or reflected away from adjoining properties in accordance with lighting standards as established by this Ordinance or other applicable Borough Ordinances.

N.   This §741 shall not apply to excavations for home sites, driveways, roads, or other approved land developments.

**742   MOBILE HOME PARK (Special Exception: S)**

A.   The use shall have a minimum net lot area of ten (10) acres.

B.   All mobile home parks shall be served by a central or community sewage disposal system and central or community water supply system.

C.   No lot in any Mobile Home Park shall be less than fifty feet (50') in width and have less than five thousand (5,000) square feet of lot area.

D.   No mobile home located on any lot within the mobile home park shall be closer to any front lot line than twenty-five feet (25'); to any side lot line than ten feet (10'); to any rear lot line than twenty feet (20').

E.   Only one accessory building shall be allowed per individual mobile home lot and such accessory structure shall not contain a greater area than fifty percent (50%) of the area of the mobile home located on the same parcel.

F.   No mobile home park shall be located in the Flood Plain Overlay District.

G.   A ten-foot-wide (10') evergreen buffer strip shall be provided along all side and rear yards that abut lots containing single-family dwellings, group homes, two-unit attached dwellings, duplexes, or townhouses. The initial height of the evergreen planting shall be five feet (5').

H.   All mobile home parks must meet Design Standards for such use set forth in the Olyphant Borough Subdivision and Land Development Ordinance.

**743   MULTI-FAMILY DWELLING, GARDEN APARTMENT, TOWNHOUSE (Special Exception: R-2)**
**RETIREMENT HOUSING (Special Exception: R-2)**
**TWO-UNIT ATTACHED DWELLING (Permitted Use: R-2)**
**DUPLEX (over/under units) (Permitted Use: R-2)**

A.   The requirements of this §743 do not apply to the construction of one (1) two-unit attached dwelling or one (1) duplex on an individual zone lot. Minimum lot, yard, and coverage requirements for one (1) two-unit attached dwelling or one (1) duplex shall be as set forth under Schedule II of this Ordinance for (TF) dwellings as noted in said Schedule II for the applicable zone district in which the two-unit attached dwelling or duplex is located.

B.   The minimum lot area per dwelling unit for structures with more than two (2) attached units shall be 3,000 square feet for each dwelling unit. The minimum lot area per dwelling unit for Retirement Housing shall be 1,000 square feet for each dwelling unit.

C.   As defined under §302 of this Ordinance, the number of dwelling units per building or structure shall be as follows:

1.   Two-unit attached or duplex: two (2)
2.   Townhouses: three (3) to six (6)

3.      Garden apartments: three (3) to eight (8)

D.      Off-street parking shall be provided in accordance with the requirements of Article X of this Ordinance.

E.      Access roads through the development, if applicable, shall comply with the street standards for Minor Streets, including minimum right-of-way widths, as required by the Olyphant Borough Subdivision and Land Development Ordinance, as amended. Direct access of individual parking spaces to the minor street shall not be permitted; instead, private access drives to the parking areas or building groups shall be provided.

F.      A ten-foot-wide (10′) evergreen buffer strip shall be provided and maintained along all side and rear yards where a multi-family project abuts any existing single- or two-unit dwellings or duplexes. The initial height of the evergreen planting shall be five feet (5′).

G.      Walkways of such design and construction as approved by the Borough shall be provided from all buildings and/or units to respective parking areas and common open space areas.

H.      Exterior storage areas for trash and rubbish shall be screened from public view on three sides and shall be contained in covered, vermin-proof containers.

I.      A minimum of two (2) changes in the front wall plane with a minimum offset of four feet (4′) shall be provided for every attached grouping of townhouses in one (1) building.

## 743A  NEW OR USED CAR, MOTORCYCLE, MOPED, ATV OR TRAILER RENTAL OR SALES (Permitted Use: C-2A, IAC, CM-2)

A.      No vehicle or trailer on display shall occupy any part of an existing street right-of-way or within the area designated as customer parking.

B.      A ten-foot-wide (10′) evergreen buffer strip shall be provided along all side and rear yards where the project abuts any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5′).

C.      The use shall comply with lighting and glare requirements as set forth in §814 of this Ordinance.

## 744   OIL AND GAS EXPLORATION, EXTRACTION, AND DEVELOPMENT (Conditional Use: CM-2)

A.      All oil and gas exploration, extraction, and development operations shall be subject to the requirements of Article IX-A of this Ordinance.

## 744A  NIGHTCLUB (Permitted Use: C-2, C-2A, IAC, CM-1, CM-2)
## TAVERN OR BOTTLE CLUB (Permitted Uses: C-1, C-2, C-2A, IAC, CM-2)

A.      Evidence of a liquor license issued by the Pa. Liquor Control Board is required prior to the issuance of a zoning permit.

B.      All activities associated with the use, including the consumption of alcoholic beverages, shall be performed within an enclosed structure.

C.      Any use that proposes seating and/or serving of alcoholic beverage on a patio, deck or other outdoor structure, shall be considered a Special Exception and require approval by the Zoning Hearing Board, in accordance with special exception procedures as set forth in the Ordinance.

**745** **OUTDOOR EXHIBITIONS, SPORTS ASSEMBLY, ENTERTAINMENT, AND AMUSEMENTS (Conditional Use: CM-1, CM-2)**

A.  Uses defined as Outdoor Exhibition, Sports Assembly, Entertainment, and Amusement in §302 of this Ordinance shall not be located closer than five hundred feet (500') from the following:

   1.  any Residential Use as listed in Schedule I and defined by Article III of this Ordinance
   2.  public or private school
   3.  cultural facility, gallery, or library
   4.  hospital

B.  Minimum setbacks shall be one hundred feet (100') for all yards for all uses defined as Outdoor Exhibition, Sports Assembly, Entertainment, and Amusement in §302 with the exception of miniature golf courses. Minimum setbacks for miniature golf courses shall be fifty feet (50') for all yards.

C.  Proof of any licensing from appropriate state or federal agencies shall be required.

D.  The noise factor shall be considered, and noise deadening devices or other means to prevent the noise from becoming objectionable to surroundings areas shall be required.

E.  A ten-foot-wide (10') evergreen buffer strip shall be provided along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

**745A** **OUTDOOR RECREATION AND SPORTS (Conditional Use: CM-1, CM-2)**

A.  Minimum setbacks shall be fifty (50') for all yards for all uses defined as Outdoor Sports in §302 of this Ordinance, with the exception of shooting ranges. Minimum setbacks for shooting or target ranges shall be five hundred feet (500') for all yards.

B.  Golf courses shall be designed that golf balls are highly unlikely to enter public roads or abutting properties. Fairways and greens shall be setback a minimum of fifty feet (50') from all property lines.

C.  Clubhouses, retail sales of equipment, swimming pools, and restaurants may be permitted as accessory uses to outdoor sports. All buildings and swimming pools shall be located no less than one hundred feet (100') from any Residential Use as listed in Schedule I and defined by Article III of this Ordinance, unless the owner of such abutting use(s) grants a waiver in writing to reduce the setback to fifty feet (50').

D.  Clubhouses, retail sales, and restaurants permitted as accessory uses shall meet minimum parking requirements for such uses set forth in Article X of this Ordinance as if they were principal permitted uses.

E.  Outdoor shooting or target ranges shall have a barrier behind the target area that is of sufficient height and thickness to adequately provide for public safety. This barrier shall be made of earth for any firearms range.

F.  An outdoor shooting or target range shall be setback a minimum of one thousand feet (1000') from any Residential Use as listed in Schedule I and defined by Article III of this Ordinance.

G.  An outdoor shooting or target range shall be fenced and properly posted, and shall comply with National Rifle Association standards and other applicable federal, state, or local regulations.

H.   Noise limits set forth in §809 of this Ordinance shall be met for all outdoor shooting or target ranges.

I.   Hours of operations for outdoor shooting or target ranges shall be limited to 9:00 AM to 7:00 PM.

## 745B   PATIO, DECK, OR GAZEBO (Permitted Accessory Use: R-1, R-2, S, C-1, C-2, CM-1, CM-2)

A.   Patios, decks, and gazebos, as defined in §302 of this Ordinance, shall be set back a minimum of five feet (5') from side and rear lot lines and shall meet minimum front yard setbacks as set forth in Schedule II of this Ordinance for the applicable zone district in which the property proposing the patio, deck or gazebo is located.

## 746   PLANNED RESIDENTIAL DEVELOPMENT (PRD/Cluster) (Special Exception: R-1, S)

It is the purpose and intent of this Section to permit and encourage a more varied, efficient, attractive and economical development pattern, to increase flexibility in the location and arrangement of homes; to provide a more usable pattern of open space; to provide for flexibility of design, and to reduce the long-term costs of maintaining infrastructure to the community while furthering the purpose of this Ordinance. The uses permitted in a Planned Residential Development may include all types of residential uses, and those nonresidential uses listed below.

A.   Procedure:

Planned Residential Developments shall be processed concurrently with the subdivision/land development process set forth in the Borough Subdivision and Land Development Regulations, and shall comply with the development requirements for a major development or subdivision.

B.   Minimum Size:

Planned Residential Developments shall contain a minimum of ten (10) acres of land that shall be part of the same parcel of land and contiguous.

C.   Lot Size and Density of Development:

The gross residential density of the PRD shall not exceed one (1) dwelling unit per 10,000 square feet. The developer shall present proposed lot sizes (length, width, and area) as a part of the plan submission. The minimum lot area for single-family detached dwelling unit lots shall be seven thousand (7,000) square feet, and a minimum of sixty percent (60%) of the dwelling types must be single-family detached units.

D.   Setbacks:

The PRD developer shall present proposed building setback lines for all lots as a part of the plan submission; however, adjacent structures shall not be located closer than thirty feet (30') to each other. Planned Residential Developments proposing to include two-unit attached dwellings, duplexes, townhouses, multi-family dwellings, garden apartments, or non-residential uses shall not locate those structures closer than fifty feet (50') to a perimeter property line of the development. Suitable landscaping and/or screening may be considered as an alternative to the 50' buffer area.

E.   Sewers:

Planned Residential Developments shall be served by a central sanitary sewer system.

F.   Water Supply:

Planned Residential Developments shall be served by a public or central water supply system. The developer or applicant must present evidence that the PRD is to be supplied by a certificated public utility, a bona fide cooperative association of lot owners, or by a municipal corporation, authority or utility. A copy of a Certificate of Public Convenience from the Pennsylvania Public Utility Commission or an application for such certificate, a cooperative agreement, or a commitment or agreement to serve the area in question, whichever is appropriate, shall be acceptable evidence.

G.   Open Space:

1.   All areas of a Planned Residential Development not conveyed to individual lot owners and not occupied by buildings and required or proposed improvements shall be dedicated in perpetuity as permanent open space to be used for the sole benefit and enjoyment of the residents of the development. Land designated as open space shall be maintained as open space and shall not be sold, used to meet open space requirements for other developments, subdivided, developed or dedicated to any other use.

2.   Open space areas shall be maintained so that their use and enjoyment as open space are not reduced or destroyed. Open space areas shall be preserved and maintained by either one or both of the following methods:

a.   Dedication to a property owners association that assumes full responsibility for protection and maintenance of the open space.

b.   Deed-restricted private ownership that shall prevent development of the open space, provide for its maintenance, and protect the rights of owners or occupants of the dwelling units of the proposed project to use and enjoy, in perpetuity, such open space.

3.   At least fifty percent (50%) of the designated open space area shall be usable for active recreational activities and shall not include wetlands or slopes over twenty-five percent (25%), or acreage used for improvements. Storm drainage facilities and sewage effluent disposal areas shall be considered improvement areas.

In no case shall less than twenty-five percent (25%) of the gross area of the tract or parcel be dedicated to open space. The developer shall submit a schedule or plan, and proposed agreement(s) showing the proposed open space ownership and maintenance, as indicated in item 2.

H.   Non-residential Uses:

Non-residential uses shall be permitted to be incorporated into the Planned Residential Development provided the following conditions are satisfied:

1.   A minimum of one-hundred (100) dwelling units must be planned for development within the contiguous area of the tract.

2.   No non-residential structures may be constructed until a minimum of fifty percent (50%) of the planned dwelling units have been constructed.

3.   Non-residential uses shall be limited to the following:

a. Non-residential uses, including areas for required off-street parking, shall not exceed ten percent (10%) of the gross area of the tract or parcel.

b. All non-residential uses shall meet the applicable zoning regulations for setbacks for the C-2A zone district (Schedule II), parking and loading areas (Schedules III and IV), and parking area landscaping requirements.

c. Only the following uses may be constructed and integrated into a Planned Residential Development:
   • Child day-care centers
   • Retail businesses serving the development, excluding nightclubs, taverns, and bottle clubs.
   • Commercial or professional offices or services, excluding auto repairs, service stations, body shops, and car washes.
   • Other non-residential uses deemed to be appropriate by the Zoning Hearing Board for incorporation in the design of the PRD.

## 747  **PRIVATE GARAGE AND CARPORT (Permitted Accessory Use: R-1, R-2, S, C-1, C-2, CM-1, CM-2)**

A. A private garage or carport attached to a principal building shall be considered a part of the principal building and shall conform to the building height limitations and minimum required setbacks for principal structures. If a driveway exists on the property, the side yard setback for an attached garage or carport shall be allowed to continue through at the same distance to the property line as the edge of driveway closest to the side yard.

B. Unattached private garages may not be erected in any required front yard, but shall be allowed in side and rear yards, provided that the regulations set forth in this §747 are met.

C. No unattached private garages shall be located closer than six feet (6') from a principal structure or exceed a wall height of eighteen feet (18').

D. All unattached private garages shall be setback from side and rear property lines a minimum of five feet (5'). If a driveway exists on the property, the side yard setback for the garage shall be allowed to continue through at the same distance to the property line as the edge of driveway closest to the side yard.

E. Unattached carports shall be prohibited.

## 748  **PRIVATE GREENHOUSE (Permitted Accessory Use: R-1, R-2, S, C-1, C-2, CM-1, CM-2)**

A. Private, noncommercial greenhouses may not be erected or established in any required front yard, but shall be allowed in side and rear yards.

B. Private greenhouses shall be setback a minimum of eight feet (8') from all side and rear property lines.

C. Private, noncommercial greenhouses shall not exceed five hundred (500) square feet of gross floor area.

D. Private, noncommercial greenhouses covered with plastic shall utilize an aesthetically-pleasing, durable plastic and not a temporary, loose, or unattached flimsy material that may tear, collapse, or cause a noise nuisance in inclement weather.

**749**  **PRIVATE INDOOR RECREATION (Special Exception Accessory Use: R-1, R-2, S; Permitted Accessory Use: CM-1, CM-2)**

A.   A private indoor recreation accessory use as defined by §302 of this Ordinance may only be approved, established, or constructed on parcels of one (1) acre or more.

B.   A private indoor recreation accessory use shall not exceed three thousand (3,000) square feet of gross floor area.

C.   The use shall only be located within a rear yard and shall be setback a minimum of twenty feet (20') from all property lines.

D.   The use shall be effectively screened from adjacent properties by evergreen plantings, subject to approval by the Zoning Officer or Zoning Hearing Board.

E.   The maximum building height shall be twenty-five feet (25').

F.   The exterior architectural appearance of the building or structure shall be compatible with that of the principal residential dwelling, subject to approval by the Zoning Officer or Zoning Hearing Board.

G.   No equipment, motors, heating or cooling systems or other similar operational apparatus shall be permitted that produces noise, noxious odor, vibration, electrical interference or radio or electromagnetic interference as regulated under Article VIII of this Ordinance. Lighting and glare associated with the use shall be subject to the requirements set forth in §814 of this Ordinance.

**750**  **FUNERAL HOME OR MORTUARY (Special Exception: C-1, C-2, C-2A)**

A.   All required off-street parking shall be provided.

B.   The outward appearance of the building shall be compatible with, and not detract from, residential areas where it may be proposed.

C.   Minimum setbacks shall be as determined by the Zoning Hearing Board.

**751**  **PRIVATE OUTDOOR TENNIS AND SIMILAR COURT (Special Exception Accessory Use: R-1, R-2, S; Permitted Accessory Use: CM-1, CM-2)**

A.   A private indoor recreation accessory use as defined by §302 of this Ordinance may only be approved, established, or constructed on parcels of one (1) acre or more.

B.   Outdoor tennis and other similar courts, including any apron or walkway, shall only be allowed in rear yards and shall be setback a minimum of fifteen feet (15') from all property lines.

C.   Outdoor tennis and other similar courts shall be completely surrounded by a fence, erected in conformance with §728 D. of this Ordinance.

D.   Lighting and glare associated with the use shall be subject to the requirements set forth in §814 of this Ordinance. All lights must be off when the court or courts are not in use.

**752**    **PRIVATE SWIMMING POOL AND HOT TUB (Permitted Accessory Use: R-1, R-2, S, C-1, C-2, CM-1, CM-2)**

A.    In-ground swimming pools shall be completely surrounded by a secure barrier, such as a fence, wall, portion of a building, or other structure not less than four feet (4') in height, constructed, installed, secured and enclosed in accordance with the requirements of the Uniform Construction Code. Pool safety and security measures shall be constructed to make it difficult for small children to climb up or slip through. All gates or door openings through the enclosure (other than a door to a building) shall be self-closing and include a self-latched device on the poolside for keeping the gate or door securely closed at times when not in use.

B.    Aboveground swimming pools shall include a secure barrier, such as a fence, wall, pool wall, or other enclosure a minimum of four feet (4') high above the surrounding average ground level, constructed, installed, secured and enclosed in accordance with the requirements of the Uniform Construction Code. Aboveground pools shall be equipped with an access ladder that can be raised and located in a position that is a minimum of four feet (4') above the surrounding ground level or otherwise completely inaccessible to children when the pool is unattended. Exempt from this enclosure requirement are portable swimming pools with a water level less than twenty-four inches (24") deep.

C.    Outdoor hot tubs must be securely covered when not in use. Swimming pools must either be drained or securely covered when not in use over an extended period of time (i.e. non-swimming season October 1 through April 30).

D.    Private swimming pools shall be setback from side property lines the same as the minimum side yard setback for the applicable zone district and ten feet (10') from rear property lines.

E.    No pool or hot tub shall be located in any front or side yard.

F.    No pool or hot tub shall be located above any underground electrical lines or under any overhead electrical lines.

G.    All private swimming pools and hot tubs shall not be filled or contain any water until all security measures and safety enclosures, as are set forth in the current edition of the Uniform Construction Code, have been completed and installed by the owner/contractor, and the owner has been issued a Certificate of Occupancy or Compliance by the Zoning Officer and/or Building Inspector.

**753**    **PUBLIC OR COMMERCIAL PARKING (Permitted Use: C-2, C-2A, CM-2)**

A.    Except in the CM-2 zone district, maximum height of a multi-level parking structure shall be forty feet (40') or three (3) levels, whichever is less.

B.    A public or commercial parking lot shall not be used for parking of heavy construction equipment, vehicle repairs or vehicle sales.

C.    Public or commercial parking lots shall be designed and landscaped in accordance with §1003 of this Ordinance.

D.    A ten-foot-wide (10') evergreen buffer strip shall be provided along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

**753A**  **GROUP PICNIC AREA OR COMMERCIAL GROVE** (Permitted Use: S, CM-1, CM-2)

A.    A minimum net lot area of two (2) acres shall be required.

B.    All structures and recreational facilities shall be set back a minimum of one hundred feet (100') from all property lines and road rights-of-way.

C.    Hours of operation shall be limited to 8:00 AM to 10:00 PM.

D.    The use shall be subject to nuisance elements as provided for in Article VIII of this Ordinance.

E.    Grass areas can be utilized for required off-street parking, but the minimum number of parking spaces shall be as required in Article X of this Ordinance. In no case, shall vehicles be allowed to park on public road rights-of-way.

F.    A land development plan shall be submitted to the Borough and approval of such plan shall be required in accordance with the Borough Subdivision and Land Development Ordinance.

**754**    **RECYCLING FACILITY** (Permitted Use: M-2, CM-2)

A.    Materials to be dropped-off, processed, separated, and/or collected shall be paper, fabric, cardboard, plastic, metal, aluminum and glass. All materials shall be kept in appropriate containers, with appropriate sanitary measures and frequent emptying to prevent the attraction of insects and/or rodents and to avoid fire hazards.

**755**    **RELIGIOUS INSTITUTION** (Special Exception: R-1, R-2, C-1, C-2, C-2A)

A.    Any meeting hall, offices for administration of the institution, banquet facility, licensed child or adult daycare, or playground shall be permitted as accessory uses in conjunction with a religious institution provided that such uses are of such a character and intensity that they would be clearly customary and incidental to the religious institution.

B.    Rectories, convents, parsonages, or other religious living quarters shall meet all applicable standards and requirements for residential uses, including the type of dwelling unit proposed in the zone district in which the quarters are located.

**756**    **RESEARCH LABORATORY** (Permitted Use: M-1, M-2, CM-2)

A.    Research activities that require outdoor facilities shall be enclosed by a fence a minimum of six feet (6') in height.

B.    Any state or federal licensing requirements shall be met and evidence of such licensing shall be provided to the Zoning Officer.

C.    A ten-foot-wide (10') evergreen buffer strip shall be provided along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

**756A**  **RESORT OR CONFERENCE CENTER** (Conditional Use: IAC, CM-1, CM-2)

A.    Resorts or conference centers must comply with all requirements for Hotels/Motels as specified under §737 of this Ordinance.

B.    In the CM- zone districts, a minimum net buildable area of ten (10) acres shall be required for a resort or conference center.

C. In the CM- zone districts, any proposed resort or conference center may provide one or more types of outdoor recreation and sports as defined by this Ordinance.

D. The outdoor recreation and sports uses proposed in conjunction with a resort or conference center shall meet all requirements for Outdoor Sports and Recreation as specified in §745A of this Ordinance.

## 757 ROOMING AND BOARDING HOUSE (Special Exception: R-2)

A. Each sleeping room shall be limited to two (2) adults, with a maximum of three (3) persons per sleeping room.

B. The use shall be limited to a maximum number of sixteen (16) residents, including all permanent residents.

C. Each rental room shall contain a minimum of one hundred fifty (150) square feet of habitable floor space.

D. One (1) full bathroom shall be provided for each four (4) rental rooms.

E. Any type of identifying sign shall be limited to a surface area of six (6) square feet per side.

F. Any state or federal licensing requirements shall be met and evidence of such licensing shall be provided to the Zoning Officer and Zoning Hearing Board.

## 758 SANITARY LANDFILL OR SOLID WASTE FACILITY (Conditional Use: CM-2)

A. Solid waste facilities, as defined and regulated by the Pennsylvania Department of Environmental Protection (DEP), shall include the following operations: landfills, transfer facility, refuse vehicle staging areas, leaf composting facility, resource recovery facility, and waste disposal and processing facility. Solid waste facilities shall also include solid waste storage areas and vehicular waste transportation staging areas defined as areas designated for the use or staging of any type of vehicle or container utilized for the use of transportation of solid waste.

B. No solid waste facility shall be located closer than five hundred feet (500') to any of the following: existing public right-of-way; property line; residential structure; public, semi-public, or institutional use; commercial or recreational facility. The access road and other improvements, serving the solid waste facility, shall be constructed according to the regulations contained in the Borough Subdivision and Land Development Regulations.

C. All solid waste facilities shall be completely enclosed by a chain link fence not less than ten feet (10') in height. The fence shall be completely erected within six (6) months after issuance of a zoning permit for the facility. All gates shall be closed and locked when the operation is closed for business. The fence and gate shall be maintained in such a manner as not to become unsightly. There shall be no advertising sign of any kind placed on the fence. The perimeter of the entire facility shall be landscaped to effectively screen the facility from adjacent properties

D. The solid waste facility's hours of operation shall be limited to the following: between the hours of 8:00 AM to 5:00 PM Monday to Friday; between the hours of 8:00 AM to 12:00 PM on Saturday: and shall not operate on Sunday or national holidays. In no event shall filled or partially filled refuse trucks be allowed to remain on site after closing time.

E. Prior to the issuance of a Zoning Permit, the owner/developer of the facility shall prepare a surface water and groundwater study for the proposed operation. The study shall detail the

existing surface and subsurface water conditions and explain the precautions that will be undertaken to prevent any surface or groundwater contamination from the proposed facility.

F.     All solid waste facilities shall comply with the applicable regulations of the Pennsylvania Department of Environmental Protection (DEP).

G.     Exempt from the provisions of this section are:

1.     Refuse vehicles parked at retail business establishments for a maximum of three (3) hours while the operator of the refuse vehicle uses the establishment.

2.     Solid waste containers designed to accept solid waste from retail business establishments, wholesale business establishments and residential buildings.

### 758A   <u>SAWMILL OR PLANING MILL</u> (Special Exception: S, CM-2)

A.     No sawmill or planing mill shall be located closer than five hundred feet (500') from any R-district or residential use as listed in Schedule I and defined by Article III of this Ordinance.

B.     No sawmill or planing mill shall operate between the hours of 6:00 PM and 8:00 AM or on Sundays or any Federally-designated holiday(s) selected by the Zoning Hearing Board as part of the Special Exception approval.

### 759   <u>COLLEGE/UNIVERSITY AND DORMITORY</u> (Special Exception: IAC, CM-2)

A.     Any proposed college or university must be an accredited educational institution or accredited medical college and proof of such accreditation shall be provided to the Zoning Officer and Zoning Hearing Board.

B.     A minimum net lot area of ten (10) acres shall be provided for any college or university and associated dormitories.

C.     A minimum setback of one hundred feet (100') shall be required for all yards.

D.     Dormitories shall be limited to full-time students, faculty, or staff of the college/university.

E.     Multiple structures on the site of a college or university shall not be closer to one another than fifty feet (50').

F.     Any proposed sports facilities associated with a college or university that fall under the definitions of Commercial Indoor Recreation, Outdoor Recreation and Sports, and/or Outdoor Exhibition, Sports Assembly, Entertainment, and Amusement as defined by this Ordinance shall comply with all applicable requirements for those types of uses as specified in this Article VII.

### 760   <u>SELF-STORAGE FACILITY</u> (Permitted Use: M-1, M-2; Special Exception: C-2A, CM-1, CM-2)

A.     Minimum distance between buildings shall be twenty feet (20').

B.     A ten-foot-wide (10') evergreen buffer strip shall be provided along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

C.     The facility shall be surrounded by a fence no less than six feet (6') in height and designed to restrict access. There shall be defined entrances and exits.

D.  No locker/warehouse shall be used for any of the following:

1.  habitation
2.  residential purposes
3.  storage or keeping of animals
4.  storage of food or other types of perishable materials
5.  storage of solid or liquid waste
6.  storage of hazardous materials

E.  No locker/warehouse shall be used for any other purpose except storage, and shall not be used for any other type of commercial or manufacturing activity. No materials, supplies, equipment, or goods shall be stored outside of the warehouse structures, with the exception of vehicles used for the operation of the facility, boats, recreational vehicles, and trailers.

F.  The use shall be provided with adequate outdoor lighting for security. Such lighting shall conform to performance standards set forth in Article §814 of this Ordinance.

G.  All applications for a zoning permit shall include detailed information on the nature and quantity of materials to be stored on the premises. Proposed space rental agreements shall be submitted with the application and shall provide specific rules to insure the requirements of this §760 are satisfied.

H.  All lockers/warehouses shall be fire and water-resistant.

## 761  SHOPPING MALL, CENTER OR PLAZA (Permitted Use: C-2A, IAC, M-1, CM-2)

A.  Any site proposed for multiple-occupant commercial establishments shall be held in single ownership or in unified control. The applicant shall provide the Borough with evidence of such ownership or control.

B.  One (1) ingress/egress point shall be allowed on each abutting street. Ingress/egress points shall be designed and constructed according to PennDOT guidelines.

C.  A ten-foot-wide (10') evergreen buffer strip shall be provided along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

## 761A  SHED AND STORAGE STRUCTURE (Permitted Accessory Use: All Zone Districts)

A.  Sheds and storage structures, as defined under Section 302 of this Ordinance, may not be erected in any required front yard, but shall be allowed in side and rear yards, provided that the regulations set forth in this §761A are met.

B.  On corner lots, sheds and storage structures shall not be located in any yard abutting a street right-of-way.

C.  Sheds and storage structures shall not be located closer than eight feet (8') from a principal structure or exceed a total height of eighteen feet (18') from floor to roof peak.

D.  Sheds and storage structures shall be setback five feet (5') from side and rear property lines.

## 762  SIGN (Permitted Accessory Use: All Zone Districts)

A.  All signs shall be subject to the requirements of Article IX of this Ordinance.

**763** **SLAUGHTERHOUSE (Conditional Use: CM-2)**

A. Any state or federal licensing requirements shall be met and evidence of such licensing shall be provided to the Zoning Officer and Zoning Hearing Board.

B. A fifty-foot-wide (50') buffer zone and a ten-foot-wide (10') evergreen planting strip shall be provided and maintained along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5'). The planting strip shall be included within the 50'-buffer zone.

**764** **SOLAR COLLECTOR (Permitted Accessory Use: All Zone Districts)**

A. Roof-mounted solar collectors shall be permitted to extend a maximum of five feet (5') above the highest point of the roof of the building or structure on which they are located, but shall not exceed the maximum allowable building height for the zone district in which they are located.

B. Ground-mounted solar collectors shall be prohibited in all R-zone districts.

C. Ground-mounted solar collectors in non-residential zone districts shall meet setbacks as determined by the Zoning Officer on a case-by-case basis. Factors in determining the minimum setback requirements for ground-mounted solar collectors shall include, but not be limited to, proximity to other structures on or off premises, roads, alleys, utility lines or easements, floodplain areas, current use of the adjacent properties, and the need for optimum collection of direct solar energy.

**764A** **SOLAR ENERGY FACILITY (Special Exception: S, CM-2)**

A. A minimum net lot area of two (2) acres shall be required. If the solar energy facility is proposed on a parcel that contains an existing use then the minimum net buildable area shall be two (2) acres plus the minimum net lot area of the existing use, as provided for under Schedule II and/or the applicable section of Article VII of this Ordinance.

B. Solar collectors shall not exceed a maximum height of twenty-five feet (25').

C. A fence may be required around the facility or portions of the facility for safety reasons. The height and type of fencing shall be as determined by the Zoning Hearing Board.

D. Landscaping may be required to screen as much of the solar energy facility features as possible. The Borough may permit any combination of existing vegetation, topography, walls, decorative fences or other features instead of landscaping, if the same achieves the same degree of screening as the required landscaping.

E. The applicant must demonstrate that it has obtained the required licenses from governing state and federal agencies. The applicant shall also document compliance with all applicable state and federal regulations. The applicant shall submit the name, address and emergency telephone number for the operator of the solar energy facility; and a Certificate of Insurance evidencing general liability coverage in the minimum amount of $1,000,000 per occurrence and property damage coverage in the minimum amount of $1,000,000 per occurrence covering the solar energy facility.

F. Access to the solar energy facility shall be provided by means of a public street or easement to a public street. The easement shall be a minimum of twenty feet (20') in width and shall be improved to a width of at least ten feet (10') with a dust-free, all-weather surface for its entire length. If the solar energy facility is fully automated, adequate parking shall be

required for maintenance workers. If the site is not automated, the number of required parking spaces shall equal the number of people on the largest shift.

G.   The applicant shall provide details about anticipated glare from the facility and document how potential nuisances to area properties and public roads will be controlled.

H.   No solar power facility shall be located within five hundred feet (500') of any structure listed on any public historic register.

I.   A clearly visible warning sign concerning voltage must be placed at the base of all pad-mounted transformers and substations.

J.   On-site transmission and power lines shall to the greatest extent possible be placed underground.

K.   Should any solar power facility cease to be used, the owner or operator or then owner of the land on which the solar power facility is located, shall be required to remove the same within one (1) year from the abandonment of use. Failure to do so shall authorize the Borough to remove the facility and assess the cost of removal to the foregoing parties. The Borough may also file a municipal lien against the land to recover the costs of removal and attorney's fees. In addition, at the time of zoning permit issuance for any solar power facility, the Borough shall require a financial guarantee, in a term, form and amount determined by the Borough Council with the advice of the Borough Solicitor, to guarantee the removal of the solar power facility.

L.   A land development plan shall be required for all solar energy facilities and approval of such plan shall be required in accordance with the Borough Subdivision and Land Development Ordinance.

## 765   **TEMPORARY USE** (Permitted Accessory Use: All Zone Districts)

The Zoning Officer may issue a temporary permit for accessory structures or uses necessary during construction, or other special circumstances or events of a nonrecurring nature, subject to the following provisions:

A.   The life of such permit, excluding a permit for a temporary portable on-demand storage container (POD) or a temporary outdoor festival, shall not exceed one (1) year and may be renewed semi-annually for an aggregate period of not more than two (2) years.

B.   Temporary portable on-demand storage containers (PODs) may be located on private property (off street) subject to the following:

1.   The POD may be located on the site for a period not to exceed sixty (60) days in duration from the time of delivery to time of removal. An extension of time may be granted by the Zoning Officer, subject to conditions for an additional time period of thirty (30) days. No more than one (1) extension of time may be granted for any POD. No POD shall be located on a specific property for more than two (2) 60-day periods in any given calendar year.

2.   PODs located on a site that is under re-construction/rehabilitation due to a fire, flood, or other natural disaster shall be exempt from Subsection 1. above and shall be allowed to remain on-site for the duration of the re-construction/rehabilitation for up to a maximum time period of eighteen (18) months.

3.   No automobile, trailer, tractor-trailer or any similar unit of this nature may be converted, altered, or changed into a POD.

4. In residential zones, no more than one (1) POD may be located on a specific property at one time or exceed a size of eight feet six inches (8'6") in height, ten feet (10') in width or twenty feet (20') in length. In non-residential zones, no more than three (3) PODs may be located on a specific property at one time or exceed a size of eight feet six inches (8'6") in height, ten feet (10') in width or forty feet (40') in length.

5. PODs shall not be located closer than five feet (5') from any side or rear property line, unless placed on an existing impervious driveway. No POD shall be located in a front yard.

6. The property owner shall be responsible to secure the POD in such a manner that it does not endanger the safety of persons or property in the vicinity of the POD. In the event of high winds or other weather conditions where the POD may become a physical danger to persons or property, the Zoning Officer or appropriate law enforcement officers may require the immediate removal of the POD.

C. Such temporary structures or uses shall be removed completely upon the expiration of the permit without cost to the Borough.

D. Recreational vehicles inhabited as temporary uses shall not be located in the Flood Plain Overlay District.

E. Temporary outdoor festivals; carnivals; celebrations; country, craft, or county fairs; block parties; or picnics, held in conjunction with profit or non-profit organizations, shall require a permit, and the use shall not be conducted for a period longer than seven (7) days. The organization or individual conducting the activity shall provide the Zoning Officer with specific information on the activity or activities to be conducted and a Certificate of Liability Insurance prior to the issuance of the zoning permit. Measures for adequate security and clean up and temporary comfort facilities may also be required. No temporary outdoor activity shall conduct any business or event defined as an Adult Business by this Ordinance.

## 765A **TRADE AND TECHNICAL SCHOOL (Permitted Use: C-2A, IAC, M-1, M-2, CM-1, CM-2)**

A. Copies of all required Federal and state permits and/or licenses shall be provided to the Zoning Officer.

## 766 **TRANSIT-RELATED BUSINESS AND MAINTENANCE FACILITY (Permitted Use: M-1, M-2, CM-2)**

A. A ten-foot-wide (10') evergreen buffer strip shall be provided and maintained along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

## 767 **WAREHOUSING, DISTRIBUTION (Permitted Use: M-1, M-2, CM-2)**
**OUTDOOR STORAGE, COMMERCIAL OR INDUSTRIAL (Permitted Accessory Use: C-2A, IAC, M-1, M-2, CM-1, CM-2)**

A. Outdoor storage facilities shall be enclosed by a fence or wall a minimum of eight feet (8') in height to conceal such facilities and contents from adjacent properties.

B. All storage of equipment, materials, and/or vehicles shall not be located in a 100-year flood plain area.

C.    A ten-foot-wide (10') evergreen buffer strip shall be provided and maintained along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

**767A  WASTEWATER TREATMENT FACILITY, NON-MUNICIPAL (Conditional Use: CM-1)**

A.    The following setbacks shall be maintained for the treatment facility and any truck parking or staging areas:

    1.    two hundred feet (200') from all property lines and road rights-of-way.

    2.    three hundred feet (300') from any existing residential structure not located on the project parcel.

    3.    two hundred feet (200') from any water body, watercourse or wetland. This shall not apply to any required discharge or intake structures at the receiving stream or water supply.

B.    Ancillary facilities such as offices, employee parking, and accessory structures shall be setback a minimum of fifty feet (50') from all property lines and road rights-of-way.

C.    The applicant shall provide a map showing the public roads in the Borough proposed to be used to access the facility and provide an evaluation of the condition of any Borough road that will be used and the potential damage that may occur from such use. The applicant shall also comply with Borough road bonding requirements, if applicable.

D.    The facility shall be subject to all applicable requirements of PA DEP and such other state and Federal requirements that may be applicable. A copy of all DEP permits and/or DEP-issued documents and reports associated with the operation shall be submitted to the Borough.

E.    Vehicle parking in accordance with Article X of this Ordinance and staging areas shall be provided on site to prevent parking or staging on any public road right-of-way.

**767B  HYDRAULIC FRACTURING WATER WITHDRAWAL FACILITY (Conditional Use: S, CM-2)**

A.    Ancillary facilities such as offices, employee parking, and accessory structures shall be setback a minimum of fifty feet (50') from all property lines and road rights-of-way.

B.    The facility shall be subject to all applicable requirements of PA DEP and such other state and Federal requirements that may be applicable. A copy of all DEP permits and/or DEP-issued documents and reports associated with the operation shall be submitted to the Borough.

C.    Vehicle parking in accordance with Article X of this Ordinance and staging areas shall be provided on site to prevent parking or staging on any public road right-of-way.

**768  WATER EXTRACTION AND BOTTLING (Special Exception: S)**

A.    All water extraction and bottling operations as defined by this Ordinance must provide the Borough with evidence of an approved construction/operation permit from the appropriate Commonwealth permitting agency.

**769  WINE TASTING ROOM (Permitted Use: C-2, C-2A, IAC, CM-1)**

A.    Any state or federal licensing requirements shall be met and evidence of such licensing shall be provided to the Zoning Officer.

– 97 –

**770** **WIND ENERGY FACILITY (WIND FARM) (Special Exception: S, CM-2)**

A.  A Zoning Permit shall be required for every wind farm and windmill installed at any location in the Borough.

B.  All other uses ancillary to the wind farm (such as a business office, maintenance depot, etc., greater than 1,000 sq. ft.) are prohibited from the wind farm. This shall not prohibit the installation as accessory structures of equipment containers not intended for human occupancy to house only equipment necessary for the operation of the wind farm.

C.  A wind farm may be permitted on a property with an existing use subject to the following land development standards:

   1.  The minimum net lot area and minimum setbacks required for the zone district shall apply to the wind farm and windmills, and the land remaining for accommodation of the existing principal use(s) on the lot shall also continue to comply with the minimum net lot area, density and other requirements of the zone district.

   2.  The vehicular access to the equipment building shall, whenever feasible, be provided along existing driveways. The applicant shall present documentation that the owner of the property has granted an easement or other legal interest for the land for the proposed facility and that vehicular access is provided to the facility.

D.  The applicant shall demonstrate that the windmills are at the minimum height required to function satisfactorily. No windmill that is taller than this minimum height shall be approved.

E.  If the parcel on which the wind farm is a separate and distinct parcel, the zone district minimum net lot area shall apply and in all cases, the lot shall be of such size that all required setbacks are satisfied. No windmill shall be located closer to any property line than one and one-half (1-½) times its height. The setback for equipment containers, other accessory structures and guy wire anchors shall be a minimum of fifty feet (50') from all property lines.

F.  If the land on which the wind farm is leased, or is used by license or easement, the setback for any windmill, the support structure, equipment containers, other accessory structures, and guy wire anchors shall be a minimum of fifty feet (50') from the line of lease, license or easement.

G.  No windmill shall be located less than one thousand feet (1,000') from any principal residential structure existing prior to the erection of the windmill.

H.  The applicant shall demonstrate that the proposed windmills are safe and the surrounding areas will not be negatively affected by structure failure, falling ice or other debris, electromagnetic fields, or radio frequency interference. All windmills shall be fitted with anti-climbing devices, as approved by manufacturers. The applicant shall submit certification from a Pennsylvania registered professional engineer that a proposed wind farm and support structure will be designed and constructed in accordance with accepted engineering practices and all requirements of any applicable construction code. Within forty-five (45) days of initial operation, the owner and/or operator of the wind farm shall provide a certification from a Pennsylvania registered professional engineer that the wind farm and all structures comply with all applicable regulations.

I.  A fence may be required around windmills and other equipment, unless the design of the structures adequately provides for safety.

J.      Landscaping may be required to screen as much of the wind farm ground features as possible, the fence surrounding the support structure, and any other ground level features (such as a building), and in general buffer the wind farm ground features from neighboring properties. The Borough may permit any combination of existing vegetation, topography, walls, decorative fences or other features instead of landscaping, if the same achieves the same degree of screening as the required landscaping.

K.      The applicant must demonstrate that it has obtained the required licenses from governing state and federal agencies. The applicant shall also document compliance with all applicable state and federal regulations. The applicant shall submit the name, address and emergency telephone number for the operator of the wind farm; and a Certificate of Insurance evidencing general liability coverage in the minimum amount of $1,000,000 per occurrence and property damage coverage in the minimum amount of $1,000,000 per occurrence covering the wind farm.

L.      Access to the wind farm shall be provided by means of a public street or easement to a public street. The easement shall be a minimum of twenty feet (20') in width and shall be improved to a width of at least ten feet (10') with a dust-free, all-weather surface for its entire length. If the wind farm site is fully automated, adequate parking shall be required for maintenance workers. If the site is not automated, the number of required parking spaces shall equal the number of people on the largest shift.

M.     Windmills shall comply with all applicable Federal Aviation Administration (FAA) and PennDOT Bureau of Aviation regulations. No windmill may be artificially lighted except as required by FAA requirements. The applicant shall provide a copy of the response to *Notice of Proposed Construction or Alteration* forms submitted to the FAA and PennDOT Bureau of Aviation.

N.     The applicant shall document that the radio, television, telephone or reception of similar signals for nearby properties will not be disturbed or diminished, and this may be accomplished by remedial measures instituted by the wind farm developer.

O.     A wind farm shall not be located within one thousand feet (1,000') of any structure listed on any public historic register.

P.     Should any wind farm or windmill cease to be used, the owner or operator or then owner of the land on which the wind farm or windmill is located, shall be required to remove the same within one (1) year from the abandonment of use. Failure to do so shall authorize the Borough to remove the facility and assess the cost of removal to the foregoing parties. The Borough may also file a municipal lien against the land to recover the costs of removal and attorney's fees. In addition, at the time of zoning permit issuance for any windmill, the Borough shall require a financial guarantee, in a term, form and amount determined by the Borough Council with the advice of the Borough Solicitor, to guarantee the removal of the windmill.

Q.     A land development plan shall be required for all wind energy facilities and approval of such plan shall be required in accordance with the Borough Subdivision and Land Development Ordinance.

**771   <u>WIND TURBINE</u> (Special Exception Accessory Use: S, M-1, M-2, CM-2)**

A.     This section shall apply to a wind turbine accessory to a principal structure or existing use that is sized and intended to be used to generate electricity for the principal structure or use to which it is accessory.

B.     No accessory wind turbine shall exceed a height (defined as Wine Turbine Height under §302 of this Ordinance) of one hundred feet (100'). Any such structure shall maintain a setback from all property lines not less than one hundred twenty percent (120%) of the height of the structure, but in no case shall be less than fifty feet (50') from any property line.

C.     The minimum height between any wind turbine blade and the ground shall not be less than thirty feet (30').

## 772   **POWER FACILITY, EXCLUDING SOLAR & WIND ENERGY (Conditional Use: M-1, M-2, CM-2)**

A.     No power facility shall be nearer to one another than two thousand feet (2,000').

B.     A power facility shall not be located within one thousand feet (1,000') of any structure listed on any public historic register.

C.     The applicant must demonstrate that it has obtained the required licenses from governing state and federal agencies.

D.     A land development plan shall be required for all power facilities and approval of such plan shall be required in accordance with the Borough Subdivision and Land Development Ordinance.

## 773   **MEDICAL MARIJUANA FACILITY (Permitted Use: M-1, M-2, CM-2)**

A.     All uses associated with medical marijuana facilities as regulated by the Medical Marijuana Act (Act 16 of 2016) shall be subject to the requirements of Article IX-B of this Ordinance.

## 774   **OUTDOOR WOOD-FIRED FURNACES (Permitted Accessory Use: All Zone Districts)**

A.     **Policy**

       Outdoor Wood-Fired Furnaces (OWFFs)

       It is in the public interest to regulate the location, design, construction, and maintenance of OWFFs. Concerns have been raised regarding the safety and environmental health effects of uncontrolled OWFFs, particularly the production of offensive odors and potential health effects of uncontrolled emissions. This Section is intended to ensure that OWFFs are utilized in a manner that does not create a nuisance and is not detrimental to the health, safety and general welfare of the citizens of Olyphant Borough.

B.     **Regulations for Outdoor Wood-Fired Furnaces (OWFFs)**

       1.     No person shall cause, allow or maintain the use of an OWFF within the Borough without first having obtained a permit from the Borough Zoning Officer.

       2.     If an OWFF existing at the time of passage of this Ordinance is replaced or upgraded, a permit shall be required and shall comply with all sections of this Ordinance.

       3.     An OWFF shall be setback from all property lines a minimum of one hundred fifty feet (150').

       4.     All new, replaced, or upgraded OWFFs shall be EPA Qualified Phase 2 Outdoor Wood-Fired Furnaces.

5.  All new OWFFs shall be installed and operated in accordance with the manufacturer's specifications. The burden of proof of compliance with the manufacturer's specifications shall be on the owner/operator of the OWFF, and the owner of any new OWFF shall produce the manufacturer's owner's manual or installation instructions to the Borough prior to installation.

6.  Only the following types of fuel shall be used in a new or existing outdoor wood-fired boiler:

    a.  Clean wood
    b.  Wood pellets made from clean wood
    c.  Home heating oil, natural gas, propane or that complies with all applicable sulfur limits and is used as a starter or supplemental fuel for dual-fired outdoor wood-fired boilers.

7.  The following are strictly prohibited from use in a new or existing outdoor wood-fired boiler:

    a.  Any material not listed in Subsection F. above
    b.  Treated or painted wood
    c.  Furniture
    d.  Garbage
    e.  Tires
    f.  Lawn clippings or yard waste
    g.  Material containing plastic
    h.  Material containing rubber
    i.  Waste petroleum products
    j.  Paints and paint thinners
    k.  Chemicals
    l.  Any hazardous waste
    m.  Coal
    n.  Glossy colored paper
    o.  Construction and demolition debris
    p.  Plywood
    q.  Particleboard
    r.  Salt water driftwood
    s.  Manure
    t.  Animal carcasses
    u.  Asphalt products
    v.  Recyclable Material as defined by Borough Ordinances

8.  Stack Height Requirements.

    a.  Existing Outdoor Wood-Fired Boilers: No person shall use or operate an outdoor wood-fired boiler that was installed before the date of enactment of this Ordinance unless it has a permanent attached stack with a minimum stack height of ten feet (10') above the ground that also extends at least two feet (2') above the highest peak of any residence located less than five hundred feet (500') from the outdoor wood-fired boiler. If the existing wood-fired boiler of a Phase 2 Outdoor Wood-fired boiler, Subsection H. 2. Below shall apply.

    b.  New Outdoor Wood-Fired Boilers: No person shall install an outdoor wood-fired boiler unless it has a permanent attached stack with a minimum stack height of ten feet (10') above the ground that also extends at least two feet

– 101 –

(2') above the highest peak of any residence located less than one hundred fifty feet (150') from the outdoor wood-fired boiler.

9. No person shall operate a new or existing outdoor wood-fired boiler between April 15 and October 15.

10. No person shall use or operate a new or existing outdoor wood-fired boiler unless it complies with all existing state and local regulations. State regulations that may apply include:

a. Prohibition of Air Pollution, 25 Pa. Code Section 121.7
b. Fugitive Emissions, 25 Pa. Code Section 123.1
c. Odor Emissions, 25 Pa. Code Section 123.31
d. Visible Emissions, 25 Pa. Code Section 123.41
e. Unlawful Conduct, Section 8 of the APCA, 35 PS Section 4008
f. Public Nuisances, Section 13 of the APCA, 35 PS Section 4013

## ARTICLE VIII

## SUPPLEMENTAL PROVISIONS

### 801   STREET FRONTAGE REQUIRED

Every principal building shall be built upon a lot with frontage upon a public street improved to meet Borough standards or for which such improvements have been insured by the posting of a performance guarantee pursuant to the Subdivision and Land Development Ordinance. However, the Borough Council may approve the subdivision and development of one single family residential lot having no road frontage but access to a public or private road by means of an approved private access drive. Flag lots, as defined in Section 302 of this Ordinance, shall be prohibited.

### 802   NUMBER OF PRINCIPAL USES ON A LOT IN SINGLE OWNERSHIP

A.   Residential Uses and Structures

    1.   Only one (1) single-family detached dwelling, two-unit attached, or duplex shall be permitted on a lot in a single ownership. Two (2) or more two-unit attached or duplex structures shall be allowed on a lot under single ownership if the structures are part of a multi-structure, multi-family residential development. See 2. below.

    2.   Two (2) or more principal multi-family dwellings are permitted on a parcel in a single ownership provided that all applicable requirements for such uses and structures as specified within the Borough Subdivision and Land Development Ordinance and elsewhere in this Zoning Ordinance are met and that the following additional requirements are met:

        a.   The minimum distance between multi-family dwelling, garden apartment, and/or townhouse structures shall be as required in §743 of this Ordinance.

B.   Non-residential Uses and Structures

    1.   Multiple principal nonresidential uses may be located within one or more buildings on a lot held in single ownership in the M-1, M-2, CM-2, or IAC zone district.

    2.   For developments with multiple principal nonresidential uses in one building on a lot, the lot, yard, coverage and height requirements of the applicable zone district set forth in Article VI shall apply to the building, as opposed to applying each of these requirements to each principal use as if each use was located on a separate lot. All uses shall comply with all other applicable requirements of this Ordinance, including parking and signs.

    3.   For developments with multiple principal nonresidential uses in multiple buildings on a lot, the lot, yard, coverage and height requirements of the applicable zone district set forth in Article VI shall apply to the lot as if all of the buildings are one building development unit, as opposed to applying each of these requirements to each use or building as if each use or building was located on a separate lot. All uses shall comply with all other applicable requirements of this Ordinance, including parking and signs.

    4.   Building and lots may include a condominium form of ownership of individual units or buildings, with a legally binding property owner or other similar type of association, if the applicant proves to the satisfaction of the Zoning Officer, Zoning Hearing Board, or Borough Council, that there will be appropriate legal mechanisms in place and compliance with applicable state law.

## 803 MAXIMUM HEIGHT OF BUILDINGS AND STRUCTURES

A.  MAXIMUM BUILDING HEIGHT. The maximum height of all buildings and structures within all Zone Districts shall be as provided for in Schedule II of this Ordinance.

B.  BUILDING HEIGHT EXCEPTIONS. District height limitations shall not apply to church spires, belfries, cupolas and domes, monuments, chimneys, farm silos, radio and television masts or aerials and parapet walls extending not more than four feet (4') above the limiting height of the building.

C.  COMMERCIAL, UTILITY AND INDUSTRIAL STRUCTURE HEIGHT EXCEPTIONS. District height limitations may be exceeded for masts, aerials, towers, chimneys, solar energy equipment, windmills, power facilities, and communications equipment. These height limitation exceptions are subject to specific-use height limitations as set forth in Article VII of this Ordinance.

## 804 PERVIOUS PAVEMENT STANDARDS REGARDING MAXIMUM LOT COVERAGE

A.  When pervious concrete pavement, as defined by this Ordinance, is used in the development of a lot, twenty-five percent (25%) of the area covered by the pervious concrete pavement shall be regarded as impervious surface and shall be calculated as part of the maximum lot coverage requirements set forth in Schedule II of this Ordinance.

B.  If other types of pervious surfaces are proposed, they will be reviewed and, if acceptable, approved on a case-by-case basis by the Borough Engineer. The credit for the pervious coverage shall be based upon actual field performance data provided by the manufacturer of such pervious surface type.

C.  Pervious concrete pavement and any other approved pervious pavement surface cannot be replaced with any impervious surface material, as defined by this Ordinance. In addition, design and maintenance of the pervious pavement surface shall be done in accordance with the Olyphant Borough Storm Water Management Ordinance and the Commonwealth's Storm Water Management Best Management Practices, regardless of the size of the pervious pavement area.

D.  Performance of the pervious concrete design, installation, and maintenance shall be guaranteed through the provision of a Developer's Agreement and through the creation of a permanent Improvement Maintenance Guarantee as set forth in the Olyphant Borough Subdivision and Land Development Ordinance, as amended.

## 805 MINIMUM NET LOT AREA PER DWELLING UNIT OR PERMITTED USE

All lots must contain a minimum net lot area per dwelling unit or permitted use as set forth under Schedule II of this Ordinance for the zoning district in which the lot is located. In calculating the minimum net lot area per dwelling unit or permitted use, one hundred percent (100%) of any existing or proposed public and/or private road rights-of-way shall be deducted. This section shall not apply to nonresidential uses in the IAC, M-1, M-2, and CM-2 zone districts. (See §802 B. of this Ordinance.)

## 806 BUFFER YARDS AND SCREENING

Buffer yards and/or screening or fencing may be required between residential and nonresidential uses or between Permitted and Special Exception or Conditional Uses. Installation and maintenance of the buffer yard or screening or fence shall be the responsibility of the applicant proposing non-residential or special exception uses and shall be a condition of the application approval. The buffer yards shall comply with the following:

A.  The buffer yard shall be measured from the lot or parcel boundary line or from the near street line where a street serves as the lot or parcel boundary line. Buffer yards may not be part of an existing or future street right-of-way, but shall be in addition to that right-of-way.

B.  The buffer yard may be coterminous with required side, or rear yards, and in case of conflict, the larger yard requirements shall apply.

C.  In all buffer yards, the exterior width beyond the planting screen shall be planted with grass seed, sod or ground cover, and shall be maintained and kept clean of all debris, and rubbish.

D.  The buffer yard shall be a landscaped area free of structures, manufacturing, processing activity, materials, storage of materials and vehicular parking. No driveways or streets shall be permitted in the buffer yards except at point of ingress or egress.

E.  All buffer yards shall include a dense, all-season screen planting of non-deciduous trees, shrubs or other plant materials, or both, to the full length of the lot line to serve as a barrier to visibility, air borne particles, glare and noise. Such screen planting shall be in accordance with the following requirements.

  1.  The screen planting shall be maintained permanently and any plant material which does not live shall be replaced within one year.

  2.  The screen planting shall be so placed that at maturity it will not be closer than one foot (1') from any street or property line or within the clear-sight triangle as defined by this Ordinance on a corner lot.

  3.  The screen planting or fence shall be broken only at points of vehicular or pedestrian access.

F.  Fences or walls may be required on an individual site basis as a supplement or alternative to required screening. Where required for screening, fences or walls shall be constructed of approved materials in accordance with §728.

## 807    PROJECTIONS INTO REQUIRED YARDS

Certain architectural features may project into required yards as follows:

A.  Cornices, canopies, eaves, and other similar architectural features may project into a side yard a distance of two feet (2'); provided, however, that where a side yard exceeds a width of twelve feet (12'), such extension may be increased by 2 inches (2") for each one-foot by which the yard exceeds a width of 12 feet (12').

B.  Fire escapes may project into side and rear yards; provided, however, that projections into side yards shall not exceed four feet, six inches (4' 6").

C.  Bay windows, balconies, fireplaces, uncovered stairways, and necessary landings, and chimneys may project a distance not exceeding four feet (4'), provided that such features do not occupy, in the aggregate, more than one-third (1/3) of the length of the building wall on which they are located.

D.  Open patios or open porches may be located in side yards and rear yards provided that they are not closer than three feet (3') to any adjacent property line. If located closer than eight feet (8'), they shall be screened in accordance with the provision of Section 806 herein. In case of a corner lot, no enclosed patios shall extend into the side yard adjoining such side street.

**808  LANDSCAPING AND NATURAL VEGETATION PROTECTION**

A.  Residential Uses.

Any part of a residential site where existing vegetation has been disturbed and is not used for dwellings, accessory structures, parking, or sidewalks shall be provided with all-season ground cover.

B.  Non-Residential Uses.

A landscaping plan for all non-residential uses shall be required. Minimum landscaping requirements shall be as follows:

1.  All disturbed areas of the site and all unusable areas in and around parking facilities shall be landscaped.

2.  Plants shall be of a type compatible with the Borough's climate.

3.  Required buffers shall be landscaped with evergreen plants and be of adequate size and maturity to provide for effective screening.

4.  Attractive natural features shall be preserved to the greatest extent possible.

5.  Plastic landscape materials shall not be used in place of live trees, shrubs, and ground cover.

6.  All trees to be planted shall have a trunk diameter of at least one inch (1") measured one foot (1') above the ground.

7.  Ground cover shall be spaced to allow for complete fill-in within one (1) year of planting.

8.  Adequate soil preparation in accordance with accepted landscaping practices shall be required.

9.  The property owner shall maintain all landscaping in good growing condition.

**809  REGULATION OF NUISANCE ELEMENTS**

No land or structure in any Zoning District shall be used or occupied in any manner that creates any dangerous, injurious, noxious, or otherwise objectionable fire, explosive, or other hazards; noise, or vibration; smoke, dust, odor or other form of air pollution; heat, electromagnetic or other radiation, or other condition in such manner or in such amount as to affect adversely the reasonable use of the surrounding area or adjoining premises.

A.  Noise Control

1.  No person shall operate or cause to be operated on private or public property any source of continuous sound (any sound which is steady, fluctuating or intermittent with a recurrence greater than one time in any fifteen (15) second interval) in such a manner as to create a sound level which exceeds the limits set forth for the receiving land use category in the following table when measured at or beyond the property boundary of the receiving land use.

**Continuous Sound Levels by Receiving Land Use**

| Receiving Land Use Category | Time | Sound Level Limit |
|---|---|---|
| Residential, Public, Open Space, Agricultural or Institutional | 1  7:00 a.m.- 7:00 p.m. | 60 dBA |
| | 2  7:00 p.m.- 7:00 a.m. plus Sundays & Legal Holidays | 50 dBA |
| Commercial or Business | 1  7:00 a.m.- 7:00 p.m. | 65 dBA |
| | 2  7:00 p.m.- 7:00 a.m. plus Sundays & Legal Holidays | 60 dBA |
| Industrial | At all times | 70 dBA |

2. For any source of sound that emits a pure tone, the maximum sound level limits set forth in the above table shall be reduced by 5 dBA. For any source of sound that emits an impulsive sound (a sound of short duration, with an abrupt onset and rapid decay and an occurrence of not more than one time in any fifteen (15)-second interval) the excursions of sound pressure level shall not exceed 20 dBA over the ambient sound pressure level, regardless of time of day or night or receiving land use, using the "fast" meter characteristic of a Type II meter, meeting the ANSI specifications S1.4-1971.

3. The maximum permissible sound levels by the receiving land use category as listed in the previous table shall not apply to any of the following noise sources:

   a. The emission of sound for the purpose of alerting persons to the existence of an emergency.

   b. Emergency work to provide electricity, water, or other public utilities when public health or safety is involved.

   c. Domestic power tools or equipment, between the hours of 8:00 AM and 9:00 PM

   d. Explosives and construction operations.

   e. Agriculture.

   f. Motor vehicle operations.

   g. Public celebrations, authorized by the Borough or a non-profit, community-based organization or religious institution.

   h. Surface carriers engaged in commerce by railroad.

   i. The unamplified human voice.

B. **Vibration Control**

   Operating or permitting the operations of any device that creates vibration that is above the vibration perception threshold of an individual at or beyond the property boundary of the source if on private property or at fifty feet (50') from the source if on a public space or public right-of-way shall be prohibited. For the purposes of this section, "vibration perception threshold" means the minimum ground-or-structure-borne vibration motion

necessary to cause a normal person to be aware of the vibration by such direct means as, but not limited to, sensation by touch or visual observation of moving objects.

C.   Outdoor Storage Control

1.   No flammable or explosive liquids, solids, or gases shall be stored in bulk above the ground except for tanks or drums of fuel directly connecting with energy devices, heating devices, or appliances located and operated on the same lot as the tanks or drums of fuel.

2.   All outdoor storage facilities for fuel, raw materials, and products stored outdoors, including those permitted in paragraph 1 above, shall be enclosed by a fence of a type, construction and size as shall be adequate to protect and conceal the facilities from any adjacent properties. Fencing shall not only encompass the question of safety but also of screening and the screening shall preferably be evergreens. All National Office of Safety and Health Administration (O.S.H.A.) regulations shall be met.

3.   No materials or wastes shall be deposited upon a lot in such form or manner that they may be transported off by natural causes or forces, nor shall any substance which can contaminate a stream or watercourse or otherwise render such stream or watercourse undesirable as a source of water supply or recreation, or which will destroy aquatic life, be allowed to enter any stream or watercourse. Applicable Department of Environmental Protection regulations shall apply.

4.   All materials or wastes which might cause fumes or dust, or which constitute a fire hazard, or which may be edible or otherwise attractive to rodents or insects, shall be stored outdoors only if enclosed in containers adequate to eliminate such hazards. Applicable Department of Health and National O.S.H.A. regulations shall apply.

D.   Sewage Waste Treatment and Disposal Control

All methods of sewage and waste treatment and disposal shall be approved by the Pennsylvania Department of Environmental Protection and in accordance with the Sewage Plan for the Borough.

E.   Dust, Dirt, Smoke, Vapors, Gases, Odors, and Heat Control

1.   The air pollution control regulations promulgated by the State Air Pollution Control Act of January 9, 1960, Public Law 2119, as amended, shall be used to control the emissions of dust, dirt, smoke, vapors, gases, odors, and heat in the Borough.

2.   The regulations are part of Title 25 Rules and Regulations, Department of Environmental Protection, Subpart C, Protection of Natural Resources, Article III Air Resources.

## 810   EXCAVATIONS, MINES AND FILL OPERATIONS

Any excavations for the removal of topsoil or other earth materials, stone or mineral products must be carried out with respect for the environment, the health, safety, welfare of the neighborhood and community and meet the specific use requirements of Article VII of this Ordinance. All mining, excavation, filling operations and expansions of the operating areas existing at the time of this Ordinance shall comply with the following permit requirements:

A.   The applicant shall submit a soil erosion and stream sedimentation plan in an acceptable form to the Lackawanna County Conservation District.

B.   The applicant may be required to submit an environmental effects study defining the impact during activity. The applicant shall submit an operating plan and schedule and a reclamation plan describing the proposed reclamation conditions after the activity is completed. At a minimum, the land shall be returned to approximately the same degree of slope as the surrounding lands and shall be planted with suitably selected new trees or other plant materials to assure a successful forest growth or other suitable re-vegetation of the site. Fill materials shall meet PA DEP approval.

C.   The applicant will assure, and may be required to post bond to assure, the Borough that the operation will be carried out in a proper manner consistent with preservation of the environment and satisfaction of appropriate State requirements and to assure maintenance of an adequate vegetative cover for a period of five (5) years following conclusion of reclamation activities.

D.   The dumping of earth, gravel, rock or other materials not subject to decay, noxious or offensive odors may be permitted in any zone or any vacant land provided that the existing grade shall not be raised more than three feet (3') above the nearest road, that hazardous or nuisance conditions are not created or that an unsightly appearance or unstable slopes are not created. No substance controlled, regulated or monitored by state or federal statute or regulation shall be transported into, transshipped, stored or disposed of within Olyphant without Borough approval.

E.   Slopes shall be covered with a suitable ground cover. A maximum of a thirty percent (30%) graded incline or decline shall be permitted in relationship to existing adjoining property grades after excavation.

F.   The Borough may require an annual permit for operations that extend beyond one (1) year and/or which change in character from the permit description of activity.

G.   All activities shall comply with all applicable State and Federal regulations, copies of required licenses and permits shall be provided to the Borough Zoning Officer.

H.   All temporary construction excavations greater than four feet (4') in depth shall be fenced during construction if left open more than twenty-four (24) hours.

## 810A   SIZE OF DWELLING UNITS

In order to promote the public health, safety and welfare of occupants residing in residential dwelling structures, minimum floor areas for human habitation shall be as required for permanent occupancy by the Uniform Construction Code.

No dwelling unit shall be less than fourteen (14') feet wide.

## 811   MOBILE HOMES/MANUFACTURED HOMES

A.   All mobile homes placed upon residential lots or within mobile home parks shall meet the specifications for manufacture of mobile homes set forth in the Uniform Construction Code, as adopted by the Borough. Zoning and Building Permits shall be required for the location and re-location of mobile homes.

B.   Mobile homes placed upon residential lots outside of mobile home parks shall comply in all respects with the requirements set forth in this Ordinance for single-family dwellings.

812  **MODULAR HOMES/INDUSTRIALIZED HOMES**

A.  All modular homes placed on residential lots shall meet the specifications for manufacture of modular homes set forth in the Uniform Construction Code, as adopted by the Borough. Zoning and Building Permits shall be required for modular homes.

B.  Modular homes shall comply in all respects with the requirements set forth in this Ordinance for single-family dwellings.

812A  **MINIMUM RESIDENTIAL LOT IMPROVEMENTS**

Any lot or parcel of land proposed for residential use, whether permanent, seasonal, part time or recreational by means of a permanent or movable housing structure or recreational vehicle shall be improved to certain minimum requirements prior to issuance of a residential occupancy permit.

The minimum required improvements shall include:

A.  A safe potable water supply and delivery system.

B.  A sewage disposal system which meets all state and Borough requirements.

C.  Required off-street parking spaces.

D.  Power supply facilities approved by the local utility company.

813  **STORM WATER MANAGEMENT**

Any development project proposed within Olyphant Borough shall meet all storm water management requirements of the Olyphant Borough Storm Water Management Ordinance and Pennsylvania Title 25, Chapter 102, Department of Environmental Protection requirements for Erosion and Sedimentation Control. Applicants for Borough Zoning and Building Permits shall prepare and submit storm water management control plans as required by these Pennsylvania Act requirements and also as required by Olyphant Borough ordinances governing site grading and drainage and storm water management. Storm Water Management Plans are subject to review and approval by the Borough Engineer.

814  **LIGHTING AND GLARE**

A.  <u>Purpose</u>. To require and set minimum standards for outdoor lighting to:

1.  Provide lighting in outdoor public places where public health, safety and welfare are potential concerns.

2.  Protect drivers and pedestrians from the glare of non-vehicular light sources that shine into their eyes and thereby impair safe traverse.

3.  Protect neighbors and the night sky from nuisance glare and stray light from poorly aimed, placed, applied, maintained or shielded light sources.

4.  Protect and retain the suburban character of the Borough.

B.  <u>Applicability</u>

1.  Outdoor lighting shall be required for safety and personal security for uses that operate during hours of darkness where there is public assembly and traverse, including but not limited to the following uses: multi-family residential, commercial, industrial, public-recreational and institutional.

2. The Zoning Officer, Zoning Hearing Board, or Borough Council may require lighting be incorporated for other uses or locations, as they deem necessary.

3. The glare-control requirements herein contained apply to lighting in all above-mentioned uses as well as, but not limited to, sign, architectural, landscape and residential lighting.

C. Criteria

1. Illumination Levels

a. Lighting, where required by this Ordinance, shall have intensities and uniformity ratios in accordance with the current recommended practices of the Illuminating Engineering Society of North America (IESNA) as contained in the IESNA Lighting Handbook.

b. Future amendments to said recommended practices shall become a part of this Ordinance without further action of the Borough.

c. Examples of intensities for typical outdoor applications, as extracted from the 8th Edition of the Lighting Handbook, are presented below.

| Lighting Intensities for Typical Outdoor Applications | | |
|---|---|---|
| (a) Parking, multi-family residential, | | |
| • Low vehicular/pedestrian activity | 0.2 Min. | 4:1 |
| • Medium vehicular/pedestrian activity | 0.6 Min. | 4:1 |
| (b) Parking, industrial/commercial/institutional/municipal | | |
| • High activity, e.g., regional shopping centers/fast food facilities, major athletic/civic/cultural events. | 0.9 Min. | 4:1 |
| • Medium activity, e.g. community shopping centers, office parks, hospitals, commuter lots, cultural/civic/ recreational events | 0.6 Min. | 4:1 |
| • Low activity, e.g., neighborhood shopping, industrial employee parking, schools, church parking. | 0.2 Min. | 4:1 |
| (c) Sidewalks | 0.5 Avg. | 5:1 |
| (d) Building entrances, commercial, industrial, institutional | 5.0 Avg. | - |
| (e) Service Station Pump Islands | 10.0 Avg. | |
| (f) Car Dealerships | 20.0 Max. | 5:1 Max :Min. |

Notes: 1. Illumination levels are maintained horizontal footcandles on the task, e.g., pavement or area surface.
2. Uniformity ratios dictate that average illuminance values shall not exceed minimum values by more than the product of the minimum value and the specified ratio. E.g., for commercial parking high activity, the average footcandles shall not be in excess of 3.6 (0.9 x 4).

2. Lighting Fixture Design

a. Fixtures shall be of a type and design appropriate to the lighting application and aesthetically acceptable to the Borough.

b. For lighting horizontal tasks such as roadways, sidewalks, entrances and parking areas, fixtures shall met IESNA "full-cutoff" criteria (no light output emitted above 90 degrees at any lateral angle around the fixture).

c. The use of floodlighting, spotlighting, wall-mounted fixtures, decorative globes and spheres and other fixtures not meeting IESNA "full-cutoff" criteria,

shall be permitted only with the approval of the Borough, based upon applicability in retaining the character of the Borough and achieving acceptable glare control.

d. When requested by the Borough, fixtures shall be equipped with or be modified to incorporate light directing and/or shielding devices such as shields, visors, skirts or hoods to redirect offending light distribution and/or reduce direct or reflected glare.

e. For residential applications, omni-directional fixtures, e.g., post top, wall bracket, wall pack, globe and sphere, shall meet IESNA "full-cutoff" criteria.

f. NEMA-head fixtures, a.k.a. "barn lights" or "dusk-to-dawn lights," shall not be permitted where they are visible from other uses, unless fitted with a reflector to render them full cutoff.

3.  <u>Control of Nuisance and Disabling Glare</u>

a. All outdoor lighting, whether or not required by this ordinance, on private, residential, commercial, industrial, municipal, recreational or institutional property; shall be aimed, located, designed, fitted and maintained so as not to present a hazard to drivers or pedestrians by impairing their ability to safely traverse and so as not to create a nuisance by projecting or reflecting light onto a neighboring use or property.

b. All outdoor lighting fixtures shall be shielded in such a manner that no light is emitted above a horizontal plane passing through the lowest point of the light emitting element, so that direct light emitted above the horizontal plane is eliminated. All individual outdoor lighting fixtures that illuminate the area under outdoor canopies shall comply with this requirement. Outdoor canopies include, but are not limited to, the following applications:

1). Fuel island canopies associated with service stations and convenience stores.
2). Exterior canopies above storefronts in shopping centers and malls.
3). Exterior canopies above driveways and building entrances.
4). Pavilions and gazebos.

c. Floodlights and spotlights shall be so installed or aimed that they do not project their output into the windows of neighboring residences, adjacent uses, skyward or onto a public roadway. The use of searchlights or laser source lights for advertising or entertainment purposes is prohibited.

d. Unless otherwise permitted by the Zoning Officer, Zoning Hearing Board, or Borough Council, e.g., for safety or security or all-night operations, lighting for commercial, industrial, public, recreational and institutional applications shall be controlled by automatic switching devices such as time clocks or combination motion detectors and photocells, to permit extinguishing outdoor lighting fixtures between 11:00 PM. and dawn, to mitigate nuisance glare and sky-lighting consequences.

e. Lighting proposed for use after 11:00 PM, or after the normal hours of operation for commercial, industrial, institutional or municipal applications, shall be reduced by seventy-five percent (75%) from then until dawn, unless supporting a specific purpose and approved by the Zoning Officer, Zoning Hearing Board, or Borough Council.

    f.    All illumination for advertising signs, buildings and/or surrounding landscapes for decorative, advertising or esthetic purposes is prohibited between 11:00 p.m. and sunrise, except that such lighting situated on the premises of a commercial establishment may remain illuminated while the establishment is actually open for business, and until one hour after closing.

    g.    Illumination for flagpole lighting may not exceed 10,000 lumens.

    h.    Vegetation screens shall not be employed to serve as the primary means for controlling glare. Rather, glare control shall be achieved primarily through the use of such means as cutoff fixtures, shields and baffles, and appropriate application of fixture mounting height, wattage, aiming angle and fixture placement.

    i.    In no case shall the intensity of illumination exceed 0.1 vertical footcandle measured line-of-site at the property line.

    j.    Externally illuminated signs and billboards shall be lighted by fixtures mounted at the top of the sign and aimed downward. Such fixtures shall be automatically extinguished between the hours of 11:00 PM and dawn except as specifically approved by appropriate officers or agents of the Borough.

    k.    Except as specifically approved by appropriate officers or agents of the Borough, fixtures meeting IESNA " full-cutoff" criteria shall not be mounted in excess of twenty feet (20') above finished grade and fixtures not meeting IESNA "cutoff" criteria shall not be mounted in excess of sixteen feet (16') above grade.

    l.    Directional fixtures for such applications as façade, fountain, feature and landscape illumination shall be aimed so as not to project their output beyond the objects intended to be illuminated, shall be extinguished between the hours of 11:00 PM and dawn and shall not be in conflict with the Borough's aim to maintain its character.

    m.    Service-station canopy lighting shall be accomplished using flat-lens full-cutoff downlighting fixtures, shielded in such a manner that the edge of the fixture shield shall be level with or below the light source envelope.

    n.    The use of white strobe lighting for tall structures such as smokestacks and chimneys is prohibited, and no lights, whatsoever, shall be mounted on a communications tower, except as may be required by the FCC, Federal Aviation Administration, or other government agency that has jurisdiction.

4.    <u>Installation</u>

    a.    For new installations, electrical feeds for fixtures mounted on poles shall be run underground, not overhead.

    b.    Poles supporting lighting fixtures for the illumination of parking areas and located directly behind parking spaces shall be placed a minimum of five feet (5') outside paved area or on concrete pedestals at least thirty inches (30") high above the pavement, or suitably protected by other approved means.

    c.    Lighting fixtures shall not be mounted in excess of twenty feet (20') above grade.

5.    Maintenance

Lighting fixtures and ancillary equipment shall be maintained so as always to meet the requirements of this Ordinance.

D.    Plan Submission

1.    For subdivision and land-development applications where site lighting is required or proposed, lighting plans shall be submitted to the Borough for review and approval and shall include:

a.    A site plan, complete with all structures, parking spaces, building entrances, traffic areas (both vehicular and pedestrian), vegetation that might interfere with lighting, and adjacent use that might be adversely impacted by the lighting, containing a layout of all proposed fixtures by location and type

b.    Isofootcandle plots for individual fixture installations, or 10' x 10' illuminance-grid plots for multi-fixture installations, that demonstrate compliance with the intensity and uniformity requirements as set forth in this Ordinance.

c.    Description of the proposed equipment, including fixture catalog cuts, photometrics, glare reduction devices, lamps, on/off control devices, mounting heights, pole foundation details and mounting methods.

2.    The Zoning Officer, Zoning Hearing Board, or Borough Council may elect, at their discretion, to require that lighting plans for other than subdivision and land development applications also be submitted to the Borough for review and approval.

3.    When requested by the Zoning Officer, Zoning Hearing Board, or Borough Council, applicant shall also submit a visual-impact plan that demonstrates appropriate steps have been taken to mitigate on-site and off-site glare and to retain the suburban character of the Borough.

4.    Post-approval alterations to lighting plans or intended substitutions for approved lighting equipment shall be submitted to the Borough for review and approval.

E.    Post Installation Inspection

The Borough reserves the right to conduct a post-installation nighttime inspection to verify compliance with the requirements of this Ordinance, and if appropriate, to require remedial action at no expense to the Borough.

F.    Compliance Monitoring

1.    Safety Hazards

a.    If the Zoning Officer, Zoning Hearing Board, or Borough Council judge a lighting installation creates a safety or personal-security hazard, the person(s) responsible for the lighting shall be notified in writing and required to take remedial action.

b.    If appropriate corrective action has not been effected within thirty (30) days of written notification, the Borough may commence legal action as provided in Section H. below.  2. Nuisance Glare and Inadequate Illumination Levels

a.    When the Zoning Officer, Zoning Hearing Board, or Borough Council judge an installation produces unacceptable levels of nuisance glare, skyward light,

– 114 –

excessive or insufficient illumination levels or otherwise varies from this Ordinance, the Borough may cause written notification of the person(s) responsible for the lighting and require appropriate remedial action.

b.    If appropriate corrective action has not been effected within thirty (30) days of notification, the Borough may commence legal action as provided in Section H. below.

G.    Nonconforming Lighting

Any lighting fixture or lighting installation existing on the effective date of this Ordinance that does not conform with the requirements of this Ordinance shall be considered as a lawful nonconformance subject to the following:

Unless minor corrective action is deemed by the Borough to be an acceptable alternative, a nonconforming lighting fixture or lighting installation shall be made to conform with the applicable requirements of this Ordinance when:

1.    It is deemed by the Borough to create a safety hazard
2.    It is replaced, abandoned or relocated
3.    There is a change in use

H.    Violations and Penalties

Any person found to be in violation of the lighting and glare regulations set forth in this section shall be subject to enforcement and penalty regulations set forth in §1209 of this Ordinance.

## 815   **WETLANDS**

If the Borough determines that wetlands may be present or may be impacted, a delineation of the wetlands, as defined and regulated by the U.S. Army Corps of Engineers and Fish and Wildlife Service, and PA DEP, may be required on any building and zoning permit proposing a new land-use or expansion of an existing use. The applicant shall be responsible for the delineation and shall guarantee that the wetlands have been properly delineated. If no wetlands are present, the applicant shall provide a certified statement to that effect.

No development in wetlands shall be undertaken except in accordance with all Federal and state wetland regulations, and evidence of such compliance shall be furnished to the Borough.

No building and zoning approval granted by the Borough shall in any manner be construed to be an approval of compliance by the applicant with any Federal or state wetland regulations. The Borough shall have no liability or responsibility to the applicant or any other person for compliance with said regulations.

## 816   **WATERCOURSES AND WATER BODY BUFFERS**

A minimum buffer zone or building setback of fifty feet (50') shall be maintained from the top of the bank of any natural watercourse or body of water for the purposes of protecting water quality and ensuring recreational access. No structures, sewage disposal systems, or any impervious surfaces shall be constructed or placed within these buffer zones; exceptions are uncovered docks, boat launches, and street or driveway crossings. In residential subdivisions, these buffer zones shall be established via a protective easement.

# ARTICLE IX

## SIGN REGULATIONS

## 901 PURPOSE

These regulations balance the need to protect the public safety and welfare, the need for a well maintained and attractive community, and the need for adequate identification, communication and advertising. The regulations for signs have the following specific objectives:

1. To ensure that signs are designed, constructed, installed and maintained according to minimum standards to safeguard life, health, property and public welfare;

2. To allow and promote positive conditions for sign communication;

3. To reflect and support the desired ambience and development patterns of the various zones, overlay zones, and plan districts and promote an attractive environment;

4. To allow for adequate and effective signs whose dimensional characteristics further the interests of public safety and the needs of the motorist, where signs are viewed from a street or roadway.

5. To ensure that the constitutionally guaranteed right of free expression is protected.

## 902 SCOPE (WHERE THESE REGULATIONS APPLY)

1. The requirements of this Article apply to all on-premise signs, sign structures, awnings, and other types of sign devices located within the Borough, except as specified in Subsection 2, below.

2. Signs and sign structures located in the Borough that cannot be seen from a public roadway are not subject to the size, height, location and number regulations listed herein. These signs must however comply with safety and construction Building Code provisions in the Borough. These types of sign include: signs inside a private property complex not seen from a public roadway; interior signs not seen from the outside of a building; signs in a shopping center that cannot be seen from a roadway.

## 903 HIERARCHY OF REGULATIONS

1. Where there is a conflict between specific sign regulations and the base or general sign regulations of this Article, the specific sign regulations supersede the base sign regulations.

2. Other conflicts. Where there is a conflict between a land use regulation and a structural regulation, or other conflicts not otherwise addressed by this Article, the most restrictive applies.

– 116 –

## 904    DEFINITIONS

**Abandoned Sign** - A sign that no longer identifies or advertises an ongoing business, product, location, service, idea, or activity conducted on the premises on which the sign is located.  Whether a sign has been abandoned or not shall be determined by the intent of the owner of the sign and shall be governed by applicable State Case Law and Statutory Law on abandoned structures.

**Alteration** – A change in the size or shape of an existing sign. Copy or color change of an existing sign is not an alteration.  Changing or replacing a sign face or panel is not an alteration.

**Animated Sign** - A sign employing actual motion, the illusion of motion, or light and/or color changes achieved through mechanical, electrical, or electronic means. Animated signs, which are differentiated from changeable signs as defined and regulated by this Article, include the following types:

1)    Environmentally Activated: Animated signs or devices motivated by wind, thermal changes, or other natural environmental input. Includes spinners, pinwheels, pennant strings, and/or other devices or displays that respond to naturally occurring external motivation.

2)    Mechanically Activated: Animated signs characterized by repetitive motion and/or rotation activated by a mechanical system powered by electric motors or other mechanically induced means.

3)    Electrically Activated: Animated signs producing the illusion of movement by means of electronic, electrical, or electromechanical input and/or illumination capable of simulating movement through employment of the characteristics of one or both of the classifications noted below:

   a)    Flashing: Animated signs or animated portions of signs whose illumination is characterized by a repetitive cycle in which the period of illumination is either the same as or less than the period of non- illumination. For the purposes of this ordinance, flashing will not be defined as occurring if the cyclical period between on-off phases of illumination exceeds four (4) seconds.

   b)    Patterned Illusionary Movement: Animated signs or animated portions of signs whose illumination is characterized by simulated movement through alternate or sequential activation of various illuminated elements for the purpose of producing repetitive light patterns designed to appear in some form of constant motion.

**Architectural Projection** - Any projection from a building that is decorative and/or functional and not intended for occupancy, and that extends beyond the face of an exterior wall of a building but that does not include signs as defined herein. See also: Awning; Back-lit Awning; and Canopy, Attached and Freestanding.

**Awning** - An architectural projection or shelter projecting from and supported by the exterior wall of a building and composed of a covering of rigid or non-rigid materials and/or fabric on a supporting framework that may be either permanent or retractable.

– 117 –

**Awning Sign** - A sign displayed on or attached flat against the surface or surfaces of an awning. See also: Wall or Fascia Sign.  An awning that contains a "sign" section or copy area shall comply with the applicable sign area requirements for parallel signs contained in this Article.  Only the sign or copy area displayed on an awning shall be used to determine the permitted sign area – the entire awning shall not be included in a Sign Area calculation. Refer also to Section 906 for visual reference example.

**Back-lit Awning** - An awning comprised of covering material exhibiting the characteristic of luminosity obtained by means of a source of illumination contained within its framework.

**Banner** - A flexible substrate on which copy or graphics may be displayed.

**Banner Sign** - A sign utilizing a banner as its display surface.

**Bench Sign** – A sign applied or affixed to the seat or back of a bench.

**Billboard** - See: Off-Premise Sign and Commercial Outdoor Advertising Sign.

**Building Facade** - That portion of any exterior elevation of a building extending vertically from grade to the top of a parapet wall or eaves and horizontally across the entire width of the building elevation.

**Building Sign** – A sign that is applied or affixed to a building.

**Candela** – The basic unit of measurement of light in SI (metric) units.

**Candela per square meter (cd/m²)** – The SI (metric) unit used to describe the luminance of a light source or of an illuminated surface that reflects light. Also referred to as Nits.

**Candle or Candlepower** - Synonymous with Candela, but in English, not SI, terms.

**Canopy (Attached)** - A multi-sided overhead structure or architectural projection supported by attachment to a building on one or more sides and either cantilevered from such building or also supported by columns at additional points. The surface(s) and/or soffit of an attached canopy may be illuminated by means of internal or external sources of light. Similar to a Marquee.

**Canopy (Freestanding)** - A multi-sided overhead structure supported by columns, but not enclosed by walls. The surface(s) and or soffit of a freestanding canopy may be illuminated by means of internal or external sources of light.

**Canopy Sign** - A sign affixed to the visible surface(s) of an attached or freestanding canopy. May be internally or externally illuminated. Similar to a Marquee Sign.

**Changeable Sign** - A sign with the capability of content change by means of manual or remote input, includes the following types:

1)  Manually Activated - Changeable sign whose message copy or content can be changed manually on a display surface.

2) Electrically Activated - Changeable sign whose message copy or content can be changed by means of remote electrically energized on-off switching combinations of alphabetic or pictographic components arranged on a display surface. Illumination may be integral to the components, such as characterized by lamps or other light-emitting devices; or it may be from an external light source designed to reflect off the changeable component display. See also: Electronic Message Center.

**Channel Letter (open faced)** – A dimensional letter with a back and sides but no face at the front of the letter. Open Faced Channel Letters may be non-lit, externally illuminated, or illuminated by a light source contained inside the open channel of the letter itself, such as a neon tube.

**Channel Letter (internally illuminated)** – A dimensional letter with a back, sides and a translucent front face capable of transmitting light from an internal light source within the letter.

**Channel Letter (reverse)** – A dimensional letter with a face and sides but no back, opposite to an Open Faced Channel Letter. A Reverse Channel Letter has an open channel facing the wall or building to which it is affixed. A Reverse Channel Letter may contain a source of illumination designed to project lighting against the surface behind the letter, commonly referred to as a Backlit Channel Letter; also referenced as a halo or silhouette lighted channel letter. The face of a Reverse Channel Letter does not illuminate.

**Cladding** – A non-structural covering designed to conceal the actual structural supports of a sign. See also pole or pylon cover.

**Commercial Outdoor Advertising Sign** - A permanent off-premise sign erected, maintained or used in the outdoor environment for the purpose of providing copy area for commercial or noncommercial messages.

**Conforming Sign** – A sign that is legally installed in conformance with all prevailing jurisdictional laws and ordinances.

**Copy** - The graphic content or message of a sign.

**Copy Area of Sign** - The actual area of the sign copy as applied to any background. Copy area on any individual background may be expressed as the sum of the geometrically computed shape or shapes encompassing separate individual letters, words, or graphic elements on the background. See Section 906 for computational methodology.

**Dimensional Letter, Symbol, or Graphic** – A letter, symbol, or graphic that is three dimensional in character, containing height, width, and depth.

**Directional Sign** - Any sign that is designed and erected for the purpose of providing direction and/or orientation for pedestrian or vehicular traffic.

**Display Time** – The amount of time a message and/or graphic is displayed on an Electronic Message Sign.

**Dissolve** – A mode of message transition on an Electronic Message Sign accomplished by varying the light intensity or pattern, in which the first message gradually appears to

dissipate and lose legibility with the gradual appearance and legibility of the second message.

**Double-faced Sign** - A sign with two faces, back to back.

**Dynamic Frame Effect** – An Electronic Message Sign frame effect in which the illusion of motion and/or animation is used.

**Electric Sign** - Any sign activated or illuminated by means of electrical energy.

**Electronic Message Center or Sign (EMC)** - An electrically activated changeable sign whose variable message and/or graphic presentation capability can be electronically programmed by computer from a remote location. Also known as an EMC. EMCs typically use light emitting diodes (LEDs) as a lighting source. (See also the following terms principally associated with Electronic Message Centers: Display Time, Dissolve, Dynamic Frame Effect, Fade, Frame, Frame Effect, Scroll, Transition, Travel)

**Externally Illuminated Sign** – See Illuminated Sign.

**Exterior Sign** - Any sign placed outside a building.

**Facade** - See Building Facade.

**Fade** – A mode of message transition on an Electronic Message Sign accomplished by varying the light intensity, where the first message gradually reduces intensity to the point of not being legible and the subsequent message gradually increases intensity to the point of legibility.

**Fascia Sign** - See Wall Sign

**Flashing Sign** - See Animated Sign, Electrically Activated.

**Font** – A set of letters, numerals, symbols, or shapes conforming to a specific set of design criteria.

**Foot Candle** – An English unit of measurement of the amount of light falling upon a surface (illuminance). One foot candle is equal to one lumen per square foot. Can be measured by means of an illuminance meter.

**Foot Lambert** – An English unit of measurement of the amount of light emitted by or reflecting off a surface (luminance) equivalent to 3.4262591 candelas per square meter.

**Frame** – A complete, static display screen on an Electronic Message Sign.

**Frame Effect** – A visual effect on an Electronic Message Sign applied to a single frame. See also Dynamic Frame Effect.

**Freestanding Sign** - A sign principally supported by one or more columns, poles, or braces placed in or upon the ground. May also be referenced as a Ground or Monument Sign. Refer also to Section 8 for visual reference examples.

– 120 –

**Frontage (Property)** - The length of the property line(s) of any single premise along either a public way or other properties on which it borders.

**Frontage (Building)** - The length of an exterior building wall or structure of a single premise along either a public way or other properties that it faces.

**Ground Sign** - See Freestanding Sign

**Illuminance** – The amount of light falling upon a real or imaginary surface, commonly called "light level" or "illumination". Measured in foot candles (lumens/square foot) in the English system, and lux (lumens/square meter) in the SI (metric) system.

**Illuminated Sign** - A sign characterized by the use of artificial light, either projecting through its surface(s) [Internally or trans-illuminated]; or reflecting off its surface(s) [Externally illuminated].

**Internally Illuminated Sign** – See Illuminated Sign.

**Interior Sign** - Any sign placed within a building, but not including window signs as defined by this ordinance. Interior signs, with the exception of window signs as defined, are not regulated by this ordinance.

**Listed Sign** – A sign manufactured and labeled in accordance with specifications promulgated by a recognized testing laboratory designed to assure compliance with applicable American National Standards (ANSI) and/or the National Electric Code (NEC).

**Luminance** – The light that is emitted by or reflected from a surface. Measured in units of luminous intensity (candelas) per unit area (square meters in SI measurement units or square feet in English measurement units.) Expressed in SI units as $cd/m^2$, and in English units as foot lamberts. Sometimes also expressed as "nits", a colloquial reference to SI units. Can be measured by means of a luminance meter.

**Lux** – The SI (metric) unit for illuminance. One lux equals 0.093 foot candles.

**Mansard** - A roof-like facade comparable to an exterior building wall.  See Section 9 (see Page 26) for visual reference

**Marquee** - See Canopy (Attached).

**Marquee Sign** - See Canopy Sign.

**Multiple-Faced Sign** - A sign containing three (3) or more faces.

**Nit** – A photometric unit of measurement referring to luminance. One nit is equal to one $cd/m^2$.

**Non-Conforming Sign** - A sign that was legally installed by permit in conformance with all municipal sign regulations and ordinances in effect at the time of its installation, but which may no longer comply with subsequently enacted laws and ordinances having jurisdiction relative to the sign.

**Non-Conforming Use** – A continued and lawful use of property, including a sign or signs lawfully installed in accordance with laws or ordinances prevailing at the time of installation.

**Off-Premise Sign** – See Off-site Advertising Sign under Section 302 of this Ordinance.

**On-Premise Sign** - A sign erected, maintained or used in the outdoor environment for the purpose of the display of messages appurtenant to the use of, products sold on, or the sale or lease of, the property on which it is displayed.

**Outdoor Advertising Sign** - A permanent sign erected, maintained or used in the outdoor environment for the purpose of the display of commercial or noncommercial messages not appurtenant to the use of, products sold on, or the sale or lease of, the property on which it is displayed. May also be referenced as an Off-Premise Sign, Billboard, or Commercial Outdoor Advertising Sign.

**Parallel Sign** – See Wall Sign

**Parapet** - The extension of a building facade above the line of the structural roof.

**Perpendicular Sign** – See also Freestanding Sign; see also Projecting Sign;

**Pole Cover or Pylon Cover** – An enclosure designed to conceal poles and/or other structural supports of a sign. See also Cladding.

**Pole Sign** - See Freestanding Sign.

**Political Sign** - A temporary sign intended to advance a political statement, cause, or candidate for office.

**Portable Sign** - Any cord-connected sign not permanently attached to the ground and can be removed without the use of tools.

**Projecting Sign** - A sign other than a Wall Sign that is attached to or projects more than eighteen (18) inches from a building face or wall or from a structure whose primary purpose is other than the support of a sign.

**Pylon Sign** – See Freestanding Sign.

**Real Estate Sign** - A temporary sign advertising the sale, lease, or rental of the property or premises upon which it is located.

**Revolving Sign** - A sign that has the capability to revolve three hundred and sixty degrees (360º) about an axis. See also: Animated Sign, Mechanically Activated.

**Roof Line** - The uppermost line of the roof of a building or, in the case of an extended facade or parapet, the uppermost point of said facade or parapet.

**Roof Sign** - A sign mounted on the main roof portion of a building or on the uppermost edge of a parapet wall of a building and which is wholly or partially supported by such building. Signs mounted on mansard facades, pent eaves, and architectural projections such as

canopies or marquees shall not be considered to be roof signs. Refer also to Section 9 (see Page 26) for visual reference example of roof signs, and comparison of differences between roof and fascia signs.

**Scroll** – A mode of message transition on an Electronic Message Sign in which the message appears to move vertically across the display surface.

**SI (International System of Units)** – The modern metric system of measurement; abbreviated SI for the French term "*Le Systeme International d'Unites*."

**Sign** - Any device visible from a public place whose essential purpose and design is to convey either commercial or noncommercial messages by means of graphic presentation of alphabetic or pictorial symbols or representations. Noncommercial flags or any other flags displayed from flagpoles or staffs will not be considered to be signs.

**Sign Copy** – The physical sign message including any words, letters, numbers, pictures, and symbols.

**Sign Structure** - Any structure designed for the support of a sign.

**Sign Area** - The area of the smallest geometric figure, or the sum of the combination of regular geometric figures, which comprise the sign face. The area of any double- sided or "V" shaped sign shall be the area of the largest single face only. The area of a sphere shall be computed as the area of a circle. The area of all other multiple- sided signs shall be computed as fifty (50) percent of the sum of the area of all faces of the sign. See Section 9 (see Page 26) for computational methodology for various sign area configurations.

**Sign Copy** - The letters, numerals, figures, symbols, logos and graphic elements comprising the content or message of a sign, exclusive of numerals identifying a street address only.

**Sign Face** - The surface upon, against or through which the sign copy is displayed or illustrated, not including structural supports, architectural features of a building or sign structure, nonstructural thematic or decorative trim, or any areas that are separated from the background surface upon which the sign copy is displayed by a distinct delineation, such as a reveal or border.

1.  In the case of panel or cabinet type signs, the sign face shall include the entire area of the sign panel, cabinet or face substrate upon which the sign copy is displayed or illustrated, but not open space between separate panels or cabinets.

2.  In the case of signs painted on a building, or individual letters or graphic elements affixed to a building or structure, the sign face shall comprise the sum of the geometric figures or combination of regular geometric figures drawn closest to the edge of the letters or separate graphic elements comprising the sign copy, but not the open space between separate groupings of sign copy on the same building or structure.

3.  In the case of sign copy enclosed within a painted or illuminated border, or displayed on a background contrasting in color with the color of the building or structure, the sign face shall comprise the area within the contrasting background, or within the painted or illuminated border.

– 123 –

**Site** – The ground area legally designated as a zoning lot, which may be categorized as a permanent parcel (a lot of record), multiple lots of record, or a portion of a lot of record.

**Special Event Sign** – A temporary sign pertaining to any civic, patriotic, or special event of general public interest.

**Temporary Sign** - A sign intended to display either commercial or noncommercial messages of a transitory or temporary nature. Portable signs or any sign not permanently embedded in the ground, or not permanently affixed to a building or sign structure that is permanently embedded in the ground, are considered temporary signs.

**Trans-Illuminated Sign** – See Internally Illuminated Sign

**Transition** – A visual effect used on an Electronic Message Sign to change from one message to another.

**Travel** – A mode of message transition on an Electronic Message Sign in which the message appears to move horizontally across the display surface.

**Under Canopy Sign or Under Marquee Sign** - A sign attached to the underside of a canopy or marquee.

**V Sign** - A sign containing two faces of equal size, positioned at an interior angle subtending less than one hundred seventy-nine degrees (179°) at the point of juncture of the individual faces.

**Wall or Fascia Sign** - A sign that is in any manner affixed to any exterior wall of a building or structure and that projects not more than eighteen (18) inches from the building or structure wall. Also includes signs affixed to architectural projections that project from a building provided the copy area of such signs remains on a parallel plane to the face of the building facade or to the face or faces of the architectural projection to which it is affixed.

**Window Sign** - A sign affixed to the surface of a window with its message intended to be visible to the exterior environment.

## 905    <u>GENERAL SIGN TYPES</u>

FREESTANDING SIGNS

usually perpendicular to viewer's line-of-sight. May be double or multi faced and contain thematic embellishment and integral covers or cladding to conceal structural supports.



PYLON

POLE WITH CLADDING

MULTI PANEL PYLON

POLE

MONUMENT

CANOPY

MONOLITH

BUILDING SIGNS

AWNING

ROOF

PROJECTING

WALL / FASCIA

**906    COMPARISON – ROOF & WALL OR FASCIA SIGNS**



**907   SIGN AREA - COMPUTATION METHODOLOGY**

### Sum of Shaded Areas Only Represent Sign Area



Freestanding Sign - Exposed Pole Support
Calculate sign area defined by actual
rectangular panel surrounding copy.



Freestanding Sign -
Thematic Embellishment - Concealed Support
Calculate sign area defined by actual
rectangular panel surrounding copy. Do not
calculate embellishment or support cladding



Freestanding Sign -
Multi Panel - Concealed Support
Calculate sign area defined by sum of actual
oval panels surrounding copy. Do not
calculate support cladding



Freestanding Sign - Monument
Thematic Embellishment - Concealed Support
Calculate sign area defined by imaginary
panel drawn around copy. Do not calculate
embellishment or monument background



Freestanding Sign - Monument
Thematic Embellishment - Concealed Support
Calculate sign area defined by actual oval
panel surrounding copy. Do not calculate
embellishment or monument background

# Sign Area Computational Methodology / Ground Signs



Freestanding Sign - Monument
Thematic Pediment.
Calculate sign area defined by sum of imaginary panels drawn around graphic and copy. Do not calculate embellishment or monument background.

SIGN AREA

 

Freestanding Canopy Sign
Calculate sign area by imaginary panel drawn around copy. Do not calculate decorative graphics. Calculation similar for attached canopy and/or marquee.

## Wall / Fascia Signs



Mixed Case Lettering. Draw imaginary panel around either ascenders or decenders, but not both.

**Signs without integral background. Calculate sign area by imaginary panel drawn around sign copy.**

 

Signs with integral background panel. Calculate sign area by area of actual background panel surrounding sign copy.

 

Awnings - Calculate sign area by imaginary panel drawn around copy. Do not calculate decorative graphics

## 908 <u>EXEMPTIONS</u>

The following are exempt from the regulations of this Article, but may be subject to other Codes enacted by the Borough where applicable:

A.  Signs which are not visible from a public roadway; however, these signs must comply with building code provisions enacted by the Borough;

B.  Signs inside a building.

C.  Signs carved into a building or raised in integral relief on a building. Signs or letters that are raised must be a physical part of the building façade to qualify under this provision; they must be a part of the physical construction of the building materials comprising the façade; letters or signs that are merely attached to the exterior façade of the building do not qualify, even if the same finish or color;

D.  Signs required by federal or state law.

E.  Flags & individual pennants (not on a string).

F.  Signs required by a municipal authority.

G.  Painted and/or applied wall accents and decorations.

H.  Illuminated building accents and decorations.

I.  Public Art, including Permitted Original Art Murals.

J.  Name and Address – Up to two (2) signs indicating address, number and/or name of occupants of the premises, that do not exceed two (2) square feet in area per side, and do not include any commercial advertising or other identification.

K.  Decals - Decals and/or logos affixed to windows or door glass panels, such as those indicating membership in a business group or identifying credit cards accepted at the establishment.

L.  Handicapped Parking Space - Signs not exceeding two (2) square feet in area reserving parking for handicapped individuals.

M.  Private Drive Signs - On-premise private drive signs are limited to one (1) per driveway entrance, not exceeding two (2) square feet in area.

N.  Public Signs - Signs erected by government agencies or utilities, including traffic, utility, safety, railroad crossing and identification signs for public facilities and any signs erected by the Borough.

O.  Security and Warning Signs - On-premise signs regulating the use of the premises, such as "no trespassing", "no hunting" and "no soliciting" signs that do not exceed one (1) sign two (2) square feet in area in residential and conservation zones and one (1) sign five (5) square feet in area in commercial, manufacturing, public, and institutional zones. These limitations shall not apply to the posting of conventional "no trespassing" signs in accordance with state law.

**909    GENERAL PROVISIONS**

A.    Any sign hereafter erected or maintained shall conform to the provisions of this Ordinance and the provisions of the Uniform Construction Code and any other ordinance or regulations of the Borough.

B.    No sign other than an official traffic sign or similar sign shall be erected within the lines of any street or public right-of-way unless specifically authorized by other ordinances or regulations of the Borough or by specific authorization of the municipal authorities.

C.    Signs projecting over public walkways may do so only subject to the projection and clearance limits either defined herein or, if not so defined, at a minimum height of ten feet (10') from grade level to the bottom of the sign. Signs, architectural projections, or sign structures projecting over vehicular access areas must conform to the minimum height clearance limitations imposed by the Borough for such structures.

D.    No sign or sign structure shall be erected at the intersection of any street in such a manner as to obstruct free and clear vision, nor at any location where by its position, shape, or color it may interfere with or obstruct the view of or be confused with any authorized traffic sign, signal or device.

E.    If a premise contains walls facing more than one property line or encompasses property frontage bounded by more than one street or other property usages, the sign area(s) for each building wall or property frontage will be computed separately for each building wall or property line facing a different frontage. The sign area(s) thus calculated may then be applied to permitted signs placed on each separate wall or property line frontage.

F.    Mechanically Activated Animated Signs and Electronically Activated Animated Signs are prohibited in all zone districts. Environmentally Activated Animated Signs and Manually Activated Changeable Signs are permitted in all zones. Electrically Activated Changeable Signs are permitted in commercial and manufacturing zones only. Changeable signs, both Manually Activated and Electrically Activated, shall be limited to fifteen (15) square feet per side of total signage area.

G.    Signs that emit smoke, visible vapors, particles, sound or odor are prohibited in all zone districts. Open flames used to attract public attention to a place of business or to an advertising sign shall be prohibited in all zone districts. No mirror device shall be used as part of a sign in any zoning district.

H.    Every sign permitted by this ordinance shall be kept in good condition and repair. When any sign becomes insecure, in danger of falling, or is otherwise deemed unsafe by the Zoning Officer, or if any sign shall be unlawfully installed, erected, or maintained in violation of any of the provisions of this ordinance, the owner thereof or the person or firm using same shall, upon written notice by the Zoning Officer forthwith in the case of immediate danger and in any case within not more than ten (10) days, make such sign conform to the provisions of this ordinance, or shall remove it. If within ten (10) days, the order is not complied with, the Zoning Officer may remove or cause such sign to be removed at the expense of the owner and/or the user of the sign.

I.    Any sign that no longer advertises or identifies a use conducted on the property on which said sign is erected must be removed within ten (10) days after written notification from the municipal Zoning Officer; and upon failure to comply with such notice, the Zoning Officer is hereby authorized to cause removal of such sign, and any expense incident thereto shall be paid by the owner of the building, structure, or ground on which the sign is located.

J.   Any sign legally existing at the time of the passage of this ordinance that does not conform in use, location, height, or size with the regulations of the zone in which such sign is located shall be considered a legal non-conforming use or structure and may continue in such status until such time as it is either abandoned or removed by its owner.

## 910   PERMITS

A.   The erection and maintenance of Temporary Signs as defined by this Ordinance shall require permits.

B.   Unless specifically exempted in §910 A. above, a permit must be obtained from the Zoning Officer for the erection and maintenance of all signs in the Borough. Exemptions from the necessity of securing a permit, however, shall not be construed to relieve the owner of the sign involved from responsibility for its erection and maintenance in a safe manner and in a manner in accord with all the other provisions of this ordinance.

C.   Before any permit is granted for the erection of a sign or sign structure requiring such permit, plans and specifications shall be filed with the Zoning Officer showing the dimensions, materials, and required details of construction including loads, stresses, anchorage, and any other pertinent data. The permit application shall be accompanied by the written consent of the owner or lessee of the premises upon which the sign is to be erected.

D.   No new sign shall hereafter be erected, constructed, or maintained except as herein provided and until after a permit, if required, has been issued by the Zoning Officer.

E.   No sign shall be enlarged or relocated except in conformity to the provisions herein, nor until a proper permit, if required, has been secured. The changing of movable parts or components of an approved sign that is designed for such changes, or the changing of copy, display and/or graphic matter, or the content of any sign or sign structure shall not be deemed an alteration.

F.   Permit fees to erect, alter, or relocate a sign shall be in accordance with the sign fee schedule adopted by the Borough.

## 911   SIGN FACE AREA

A.   Sign cabinets. The area of sign faces enclosed in frames or cabinets is determined based on the outer dimensions of the frame or cabinet

B.   Double sided signs. Only one (1) side of a double sided sign is counted in determining the area of sign faces. Where the two (2) sides are not of equal size, the larger of the two (2) sides is used for the determination of sign area. The area of multiple-faced signs in which the interior angle formed by the faces is greater than ninety-one degrees (91°) shall be expressed as the sum of the areas of all the faces, except for multiple-faced signs containing faces that are configured back to back, in which case the area of the faces configured back to back will be calculated according to the rule for double-faced signs.

C.   Round, Oval & irregularly shaped signs. To be measured based on the appropriate mathematical formula to obtain the sign area for a circle, an oval or irregularly shaped sign.

D.  Calculating Sign Area

1.  Signs containing integral background areas: The area of a sign containing a clearly defined background area shall be calculated based on the area of the smallest standard geometric shape or combination of geometric shapes capable of encompassing the perimeter of the background area of the sign. In the case of signs in which multiple background areas are separated by open space, sign area shall be calculated based on the sum of the areas of all separate background areas, calculated as referenced above, but without regard for any open space between the separate background areas.

2.  Signs without integral background areas: In instances in which a sign consists of individual elements such as letters, symbols, or other graphic objects or representations that are painted, attached to, or otherwise affixed to a surface such as a wall, window, canopy, awning, architectural projection, or to any surface not specifically designed to serve as a sign background, the sign area shall be based on the sum of the individual areas of the smallest geometric shape or combination of geometric shapes capable of encompassing the perimeters of the individual elements comprising the sign.

E.  Awnings and marquees. When graphics or sign copy is incorporated into an awning, the sign area is determined by computing the area of a standard imaginary geometric shape or combination of shapes drawn around the sign copy area or graphics. When the ends of awnings or marquees are parallel and contain graphics or sign copy, only one side is counted in addition to the sign face area on the front.

## 912  MEASURING HEIGHT OF SIGNS

A.  The overall height of a freestanding sign or sign structure is measured from the lowest point of the ground directly below the sign to the highest point of the freestanding sign or sign structure.

B.  Exception: Where a freestanding sign or sign structure is mounted along a roadway that has a higher grade level as compared to the grade level directly below the freestanding sign or sign structure, then the freestanding sign or structure's height will be measured from the roadway grade level to the highest point of the freestanding sign or sign structure. See Figure A.



**FIGURE A**

– 132 –

## 913   ELECTRICAL STANDARDS

No sign shall be illuminated by other than electrical means, and electrical devices, components, and wiring shall be installed and maintained in accordance with the requirements of the electrical code as adopted by the Borough.

## 914   SIGN ILLUMINATION STANDARDS

Where permitted, signs may be illuminated consistent with the following standards:

A.   Signs that are illuminated at night may not exceed a maximum luminance level of seven hundred fifty (750) cd/m² or Nits, regardless of the method of illumination.

B.   Signs that have external illumination, whether the lighting is mounted above or below the sign face or panel, shall have lighting fixtures or luminaires that are fully shielded.

C.   All illuminated signs must comply with the maximum luminance level of seven hundred fifty (750) cd/m² or Nits at least one-half hour before Apparent Sunset, as determined by the National Oceanic and Atmospheric Administration (NOAA), US Department of Commerce, for the specific geographic location and date. All illuminated signs must comply with this maximum luminance level  throughout the night, if the sign is energized, until Apparent Sunrise, as determined by the NOAA, at which time the sign may resume luminance levels appropriate for daylight conditions, when required or appropriate.

D.   On-premise signs do not constitute a form of outdoor lighting at night, and are exempt from any other outdoor lighting regulations under Section 814 of this Ordinance.

## 915   ELECTRONIC MESSAGE CENTERS

A.   In the C-, M-, IAC, and CM- zoning districts, Electronic Message Centers (EMCs) are permitted in accordance with the sign areas requirements of Section 916 D. of this Ordinance.

B.   Additional general EMC regulations:

   (1)   An EMC sign may be a portion of a building sign or freestanding sign, or may comprise the entire sign area.

   (2)   All EMC signs shall have automatic dimming controls, either by photocell (hardwired) or via software settings, in order to bring the EMC lighting level at night into compliance with Section 913 of this Ordinance. "Sign Illumination Standards".

## 916   REGULATION BY ZONING DISTRICT

A.   On-Premise Signs Permitted In All Zones

   In addition to any signs designated as allowable in this Ordinance, the following signs and/or sign types are permitted in all zones:

   1.   One sign per premises or property, suitable for the display of commercial or non-commercial speech, provided that the area of any such sign shall not exceed six (6) square feet, and further provided that, if freestanding, such sign shall not exceed a height above the grade level on which it is placed of four feet (4') to the top of the

sign. Premises or properties with frontage on more than one street shall be permitted one such sign on each separate street frontage.

2.  Real Estate signs as defined herein, provided that the area of such signs shall not exceed the following limitations by zone:

>   Residential and Conservation - six (6) square feet
>   Commercial, Institutional, Public, & Manufacturing - twelve (12) square feet

and further provided that not more than one (1) such sign shall be placed on property held in single and separate ownership unless such property fronts on more than one street, in which case one such sign shall be permitted on each street frontage side only during the time in which the property advertised is available for sale, lease, or rental, and must be removed within ten (10) days after execution of an agreement of sale, lease, or rental.

3.  Memorial signs or historical signs or tablets, provided that the area of any such sign shall not exceed four (4) square feet.

4.  Directional signs as defined herein and as required on any premises or property provided that the area of any such sign shall not exceed the following limitations by zone:

>   Residential - four (4) square feet.
>   All other zones - nine (9) square feet.

B.  <u>On-Premise Signs Permitted In R- and S-Zones</u>

1.  Signs of contractors or artisans displayed during the period such contractors or artisans are performing work on the premises on which such signs are displayed, provided that the area of any such sign shall not exceed twelve (12) square feet. Such signs shall be limited to one (1) sign per contractor or artisan, and shall be removed immediately upon completion of the work of the contractor or artisan.

2.  One sign per premises advertising a Minimal Impact Home-Based Business provided that the area of any such sign shall not exceed two (2) square feet.

3.  Permanent subdivision identification signs, and/or signs identifying apartment or condominium complexes, provided that the area of any such sign shall not exceed thirty-two (32) square feet, and further provided that one (1) such sign shall be permitted for each separate street and/or separate building frontage occupied by the subdivision, apartment, or condominium complex and/or for each means of entrance to or exit from the subdivision, apartment, or condominium complex.

4.  Signs for permitted non-residential or permitted institutional uses provided that the area of any such sign shall not exceed thirty-two (32) square feet, and further provided that one (1) such sign shall be permitted for each separate street and/or separate building frontage occupied by the permitted use, and for each means of entrance to or exit from the permitted use.

C.  <u>General Regulation - On-Premise Signs In R- and S-Zones</u>

1.  Unless otherwise regulated by specific reference herein, freestanding signs shall be limited to a height above the grade level on which they are placed of nine (9') feet to the top of the sign.

2.      Animated and Illuminated Signs are prohibited.

3.      Roof Signs are prohibited.

D.      <u>On-Premise Signs Permitted In C-, M- IAC, and CM- Zones</u>

1.      Freestanding Signs:

a.      Freestanding signs shall be limited to one (1) except for a use that fronts on more than one street or other property usage, in which case one (1) such sign shall be permitted for each separate street frontage or frontage on other property usage. If a use exceeds three hundred lineal feet (300') on any frontage, one additional such sign on such frontage shall be permitted; and for each multiple of three hundred lineal feet (300') of frontage thereafter, one additional such sign shall be permitted for each separate street frontage or frontage on other property usage.

Unless otherwise regulated by specific reference herein, the area and height above grade of any freestanding sign shall not exceed one hundred (100) square feet in area and thirty (30') in height above grade.

b.      In the case of a use designated as a shopping center or planned industrial park with more than one business, one (1) freestanding sign per each three hundred lineal feet (300') of frontage or multiple thereof displaying all the business names shall be permitted for each separate street frontage, frontage on other property usage, and/or for each means of entrance to or exit from the use. The area and height of any such sign shall not exceed thirty-two (32) square feet per business or one hundred ninety-two (192) square feet in total sign area, regardless of the number of businesses, and thirty (30') in height above grade.

c.      Within the environs of a use designated as a shopping center or planned industrial park, freestanding signs shall be permitted as required for the primary purpose of promoting traffic safety through the provision of directional information within the environs of the use, provided that any such sign shall not exceed an area and height of thirty-two (32) square feet in area and ten (10') in height above grade.

2.      Parallel Signs:

a.      Parallel Signs include wall or fascia signs, roof signs, and permanently applied window signs or signs otherwise permanently applied to walls or other building surfaces.

b.      The total area of all signs affixed or applied essentially in a parallel plane to any given building facade shall not exceed an area computed as a percentage of the building facade, including window and door areas and cornices to which they are affixed or applied in accordance with Table I below:

| TABLE I - PARALLEL SIGNS | |
|---|---|
| DISTANCE of sign from road | PERCENTAGE of building face or wall permitted for sign area |
| 0 to 100 feet | Fifteen (15%) |
| 101 - 300 feet | Twenty (20%) |
| Over 300 feet | Twenty-Five (25%) |

c.  In the case of a shopping center or a group of stores or other business uses on a lot held in single and separate ownership, the provisions of this section relating to the total area of signs permitted on a premises shall apply with respect to each building, separate store, or similar use.

d.  Roof signs, Special Considerations:

1.  The area calculation in accordance with Table I for any roof sign whose orientation on a roof may be other than parallel to an individual building facade shall be computed with reference to the building facade which most closely parallels the orientation of such sign.

3.  Canopy Signs (Also Marquee Signs and Signs on Architectural Projections):

a.  Signs affixed or applied in an essentially flat plane to the face of a building or freestanding canopy, marquee, or architectural projection provided that the copy area of any such sign, as defined herein, does not exceed an area equal to forty percent (40%) of the product of the height and length of the face area of the canopy, marquee, or architectural projection to which such sign is affixed or applied.

b.  Graphic treatment in the form of striping or patterns shall be permitted on the face of any building or freestanding canopy, marquee, or architectural projection without restriction, and the area of any such graphic treatment shall not be calculated as a component of permitted copy area.

4.  Awning Signs:

a.  Signs affixed or applied to the face or side surfaces of an awning or backlit awning provided that the copy area of any such sign, as defined herein, does not exceed an area equal to fifty percent (50%) of the total background area of the awning or backlit awning surface to which it is affixed or applied; or alternatively, does not exceed an amount equal to the amount of copy area permitted for parallel signs as provided herein, whichever is greater.

b.  Graphic treatment and/or embellishment in the form of striping, patterns, or valances shall be permitted on the face or side surfaces of any awning or backlit awning without restriction, and the area of any such graphic treatment and/or embellishment shall not be calculated as a component of permitted copy area.

5.  Projecting Signs:

a.  Projecting signs shall be limited to one (1) per building facade on which any

such sign is mounted except for a use that fronts on more than one street or other property usage, in which case, one (1) such sign shall be permitted per facade for each separate street frontage or frontage on other property usage. In the case of a building in which any individual facade exceeds two hundred lineal feet (200'), one (1) such sign shall be permitted for each two hundred lineal feet (200') of such facade or multiple thereof on each separate street or other property usage on which such facade fronts.

b.      The area of any projecting sign shall not exceed one (1) square foot per every two (2) lineal feet of the building facade on which such sign is mounted, except that no such sign shall be larger in area than thirty-two (32) square feet.

c.      No projecting sign shall extend in a vertical dimension above the highest architectural point of the facade to which it is mounted in excess of twenty-five percent (25%) of the vertical dimension of the facade itself.

d.      Projecting signs extending over a public sidewalk shall be limited to a projection distance not to exceed two-thirds (2/3) of the width of the sidewalk.

e.      Projecting signs shall not be permitted in addition to any permitted freestanding signs on any given property frontage, except that, in the case in which a premises is permitted either freestanding or projecting signs on any one frontage, projecting signs may be substituted for any of the permitted freestanding signs on such frontage, provided that the requirements herein specifically relating to size, height, and extension of projecting signs are met.

6.      Under Canopy Signs:

Signs affixed to the underside of a canopy, marquee, or architectural projection shall be limited to a copy area not to exceed eight (8) square feet. One such sign shall be permitted for each means of entrance to or exit from a premises utilizing a canopy-type structure, and/or for every one hundred lineal feet (100') of such canopy-type structure.

# ARTICLE IX-A

## OIL AND GAS EXPLORATION, EXTRACTION, AND DEVELOPMENT

### 901-A  PURPOSE

The purpose of this article is to provide for the reasonable development of land for oil and gas drilling while providing adequate health, safety and general welfare protections of the Borough's residents. Oil and gas exploration, drilling and extraction operations involve activities that are economically important and will impact the Borough. Accordingly, it is necessary and appropriate to adopt reasonable requirements for oil and gas resource development so that these resources can be obtained in a manner that is economically remunerative, and that minimizes the potential impact on the residents of the Borough.

### 902-A  DEFINITIONS

**Applicant** - Any person, owner, operator, partnership, company, corporation and its subcontractors and agents who has an interest in real estate for the purpose of exploring or drilling for, producing, or transporting oil or gas.

**Building** - An occupied structure with walls and roof with which persons live or customarily work. The term shall not include a barn, shed or other storage building.

**Collector Street** - A public street or road which, in addition to providing access to abutting lots, intercepts local streets and provides a route for carrying considerable volumes of local traffic to community facilities and arterial streets. For the purposes of this Article IX-A, all state- and county-owned roads are considered collector streets.

**Department** - The Pennsylvania Department of Environmental Protection (PA DEP).

**Derrick** - Any portable framework, tower mast and/or structure which is required or used in connection with drilling or re-working a well for the production of oil or gas.

**Drilling Pad** - The area of surface operations surrounding the surface location of a well or wells. Such area shall not include an access road to the drilling pad.

**Fracking** - The process of injecting water, customized fluids, sand, steam, or gas into a gas well under pressure to improve gas recovery.

**Local Street** - A public street or road designed to provide access to abutting lots and to discourage through traffic.

**Oil and Gas** - Crude oil, natural gas, methane gas, coal bed methane gas, propane, butane and/or any other constituents or similar substances that are produced by drilling an oil or gas well.

**Oil and Gas Development or Development** - The well site preparation, construction, drilling, redrilling, hydraulic fracturing, and/or site restoration associated with an oil or gas well of any depth; water and other fluid storage, impoundment and transportation used for such activities; and the installation and use of all associated equipment, including tanks, meters, and other equipment and structures whether permanent or temporary; and the site preparation, construction, installation, maintenance and repair of oil and gas pipelines and associated equipment and other equipment and activities associated with the exploration for, production and transportation of oil and gas. The definition does not include natural gas compressor stations and natural gas processing plants or facilities performing the equivalent functions.

– 138 –

**Oil or Gas Well** - A pierced or bored hole drilled or being drilled in the ground for the purpose of, or to be used for, producing, extracting or injecting gas, oil, petroleum or another liquid related to oil or gas production or storage, including brine disposal.

**Oil or Gas Well Site** - The location of facilities, structures, materials and equipment whether temporary or permanent, necessary for or incidental to the preparation, construction, drilling, production or operation of an oil or gas well. This definition also includes exploratory wells.

**Operator** - The person designated as the well operator on the permit application or well registration.

**Owner** - A person, who owns, manages, leases, controls or possesses an oil or gas well.

**Natural Gas Compressor Station** - A facility designed and constructed to compress natural gas that originates from an gas well or collection of such wells operating as a midstream facility for delivery of gas to a transmission pipeline, distribution pipeline, natural gas processing plant or underground storage field, including one or more natural gas compressors, associated buildings, pipes, valves, tanks and other equipment.

**Natural Gas Processing Plant** - A facility designed and constructed to remove materials such as ethane, propane, butane, and other constituents or similar substances from natural gas to allow such natural gas to be of such quality as is required or appropriate for transmission or distribution to commercial markets but not including facilities or equipment that is designed and constructed primarily to remove water, water vapor, oil or naturally occurring liquids from the natural gas.

**Storage Well** - A well used for and in connection with the underground storage of natural gas, including injection into or withdrawal from an underground storage reservoir for monitoring or observation of reservoir pressure.

## 903-A   ZONING CLASSIFICATIONS

Subject to the provisions of this ordinance:

A.   An oil or gas well site that would be placed more than five hundred feet (500') from all property lines of the property where the oil or gas well is sited is permitted within the CM Zoning District as a Conditional Use.

B.   Oil and gas well sites are prohibited within all other Zoning Districts.

C.   A natural gas compressor station or a natural gas processing plant or any similar facilities performing the equivalent functions that would be located more than one thousand feet (1000') from all property lines of the property where the natural gas compressor station or the natural gas processing plant or similar facility is located is permitted within the CM Zoning District as a Conditional Use.

D.   Natural gas compressor stations or natural gas processing plants or any similar facilities performing the equivalent functions are prohibited within all other Zoning Districts.

## 904-A   APPLICABILITY

A.   This Article IX-A applies to all oil and gas well sites, natural gas compressor stations, and natural gas processing plants that will be permitted or constructed after the effective date of this ordinance.

B.   Oil and gas well sites, natural gas compressor stations, and natural gas processing plants that were permitted or constructed prior to the adoption of this ordinance shall not be

required to meet the requirements of this ordinance; provided that any modification to an existing or permitted oil or gas well site that occurs after the effective date of this ordinance and materially alters the size, type, location, number of wells and other accessory equipment or structures, or any physical modifications to an existing natural gas compressor station or natural gas processing plant shall require compliance with and a permit under this ordinance.

C.   Federal or state law or regulation preempts ordinance requirements that conflict with federal or state statute or regulation. Olyphant Borough acknowledges that it is pre-empted from regulating the operational methods of the oil and gas industry and may only regulate land uses.

## 905-A   PERMIT REQUIREMENT

A.   No oil or gas well site, natural gas compressor station, or natural gas processing plant or an addition to an existing oil or gas well site, natural gas compressor station, or natural gas processing plant shall be constructed or located within Olyphant Borough unless a zoning permit has been issued by the Borough to the owner or operator approving the construction or preparation of the site for oil or gas development or construction of natural gas compressor stations or natural gas processing plants.

B.   The zoning permit application, or amended zoning permit application, shall be accompanied by a fee as established by resolution in the Borough's schedule of fees.

C.   Any modification to an existing and permitted oil or gas well site that materially alters the size, location, number of wells or accessory equipment or structures, or any modification to an existing natural gas compressor station or natural gas processing plant shall require a modification of the zoning permit under this ordinance. Like-kind replacements shall not require a zoning permit modification.

## 906-A   PRE-APPLICATION CONFERENCES

A.   *Purpose*

Before submitting an application the applicant is strongly encouraged to meet with Borough officials to determine the requirements of and the procedural steps and timing of the application. The intent of this process is for the applicant to obtain necessary information and guidance from the Borough before entering into any commitments or incurring substantial expenses with regard to the site and plan preparation.

B.   *Process*

A pre-application conference is voluntary on the part of the applicant and shall not be deemed the beginning of the time period for review as prescribed by law. The pre-application conferences are intended for the benefit of the applicant in order to address the required permit submittals and are advisory only, and shall not bind the Borough to approve any application for a permit or to act within any time limit relative to the date of such conference.

## 907-A   PERMIT APPLICATION AND REQUEST FOR HEARING

A.   The applicant shall provide to the Borough a request for a Conditional Use Hearing, applicable fees, and a permit application with the following:

1. A narrative describing an overview of the project including the number of acres to be involved, the number of wells to be drilled, and the location, and number and description of equipment and structures to the extent known.

2. A narrative describing an overview of the project as it relates to natural gas compressor stations or natural gas processing plants.

3. The address of the oil or gas well site, natural gas compressor station or natural gas processing plant as determined by the Borough for information of Emergency Responders.

4. The contact information of the individual or individuals responsible for the operation and activities at the oil or gas well site shall be provided to the Borough and all Emergency Responders. Such information shall include a phone number where such individual or individuals can be contacted twenty-four hours per day, three-hundred sixty-five days a year. Annually, or upon any change of relevant circumstances, the applicant shall update such information and provide it to the Borough and all Emergency Providers.

5. A location map of the oil or gas well site showing the approximate location of derricks, drilling rigs, equipment and structures and all permanent improvements to the site and any post construction surface disturbance in relation to natural and other surroundings. Included in this map shall be an area within the development site for the location and parking of vehicles and equipment used in the transportation of personnel and/or development and use of the site. Such location shall be configured to allow the normal flow of traffic on public streets and shall be undisturbed.

6. A location map of the natural gas compressor station or natural gas processing plant including any equipment and structures and all permanent improvements to the site.

7. A narrative and map describing the manner and routes for the transportation and delivery of equipment, machinery, water, chemicals and other materials used in the siting, drilling, construction, maintenance and operation of the oil or gas well site.

8. A certification or evidence satisfactory to the Borough that, prior to the commencement of any activity at the oil or gas well site, the applicant shall have accepted and complied with any applicable bonding and permitting requirements; and shall have entered into a Borough roadway maintenance and repair agreement with the Borough, in a form acceptable to the Borough solicitor, regarding the maintenance and repair of the Borough streets that are to be used by vehicles for site construction, drilling activities and site operations.

9. A description of, and commitment to maintain, safeguards that shall be taken by the applicant to ensure that Borough streets utilized by the applicant shall remain free of dirt, mud and debris resulting from site development activities; and the applicant's assurance that such streets will be promptly swept or cleaned if dirt, mud and debris occur as a result of applicant's usage.

10. Verification that a copy of the operation's Preparedness, Prevention and Contingency Plan has been provided to the Borough and all Emergency Responders.

11. A statement that the applicant, upon changes occurring to the operation's Preparedness, Prevention and Contingency Plan, will provide to the Borough and all Emergency Responders the dated revised copy of the Preparedness, Prevention and Contingency Plan while drilling activities are taking place at the oil or gas well site.

12. Assurance that, at least 30 days prior to drilling, the applicant shall provide an appropriate site orientation and training course of the Preparedness, Prevention and Contingency Plan for all Emergency Responders. The cost and expense of the orientation and training shall be sole responsibility of the applicant. The applicant shall not be required to hold more than one site orientation and training course annually under this section.

13. A copy of the documents submitted to the department (PA DEP), or if no document has been submitted to the department (PA DEP), a narrative describing the environmental impacts of the proposed project on the site and surrounding land and measures proposed to protect or mitigate such impacts.

14. A copy of all permits and plans from appropriate regulatory agencies or authorities issued in accordance to environmental requirements.

15. A copy of all permits and plans from the appropriate regulatory agencies or authorities issued in accordance with applicable laws and regulations for the proposed use.

## 908-A  DESIGN AND INSTALLATION

A. *Access*

1. No oil or gas well site shall have access solely through a local street. Access to the oil or gas well site shall be from a collector street.

2. Accepted professional standards pertaining to minimum traffic sight distances for all access points shall be adhered to.

B. *Structure Height*

1. Permanent structures associated with an oil and gas site, both principal and accessory, shall comply with the height regulations for the zoning district in which the oil or gas well site is located.

2. Permanent structures associated with natural gas compressor stations or natural gas processing plants shall comply with the height regulations for the zoning district in which the natural gas compressor station or natural gas processing plant is located.

3. There shall be an exemption to the height restrictions contained in this section for the temporary placement of drilling rigs, drying tanks, and other accessory uses necessary for the actual drilling or re-drilling of an oil or gas well.

   a. The duration of such exemption shall not exceed the actual time period of drilling or re-drilling of an oil or gas well.

   b. Provided further the time period of such drilling and exemption shall not exceed six (6) months.

   c. The operator shall give the Borough prior written notice of the beginning date for its exercise of the exemption.

C.    *Setbacks*

    1.    Drilling rigs shall be located a minimum setback distance of 2.5 times their height from any property line, public or private street, or building not related to the drilling operations on either the same lot or an adjacent lot.

    2.    The drilling pad for the oil or gas well site shall comply with all setback and buffer requirements of the zoning district in which the oil or gas well site is located.

    3.    Natural gas compressor stations or natural gas processing plants shall comply with all setback and buffer requirements of the zoning district in which the natural gas compressor station or natural gas processing plant is located.

    4.    Exemption from the standards established in this subsection may be granted by the Borough upon a showing by the operator that it is not feasible to meet the setback requirements from surface tract property lines and that adequate safeguards have or will be provided to justify the exemption.

    5.    Drilling pads, natural gas compressor stations or natural gas processing plants shall be set back two hundred feet (200') from buildings or sites registered or eligible for registration on the National Register of Historic Places or the Pennsylvania Register of Historic Places.

D.    *Screening and Fencing*

    1.    Security fencing shall not be required at oil or gas well sites during the initial drilling, or re-drilling operations, as long as manned 24-hour on-site supervision and security are provided.

    2.    Upon completion of drilling or re-drilling, security fencing consisting of a permanent chain link fence shall be promptly installed at the oil or gas well site to secure well heads, storage tanks, separation facilities, water or liquid impoundment areas, and other mechanical and production equipment and structures on the oil or gas well site.

    3.    Security fencing shall be at least six feet (6') in height equipped with lockable gates at every access point and having openings no less than twelve feet (12') wide. A landscaped buffer strip shall be provided on the outside of the fencing.

    4.    Emergency Responders shall be given means to access oil or gas well site in case of an emergency.

    5.    Warning signs shall be placed on the fencing surrounding the oil or gas well site providing notice of the potential dangers and the contact information in case of an emergency.

    6.    In construction of oil or gas well sites the natural surroundings should be considered and attempts made to preserve existing trees and other native vegetation.

E.    *Lighting*

    1.    Lighting at the oil or gas well site, or other facilities associated with oil and gas drilling development, either temporary or permanent, shall be directed downward and inward toward the activity, so as to minimize the glare on public roads and nearby buildings within one hundred feet (100') of the oil or gas well development.

2. Lighting at a natural gas compressor station or a natural gas processing plant shall be limited to security lighting.

F. *Noise*

1. The applicant shall take the following steps to minimize noise resulting from the oil or gas well development.

2. Prior to drilling of an oil or gas well or the operation of a natural gas compressor station or a natural gas processing plant, the applicant shall establish by generally accepted testing procedures, the continuous seventy-two (72) hour ambient noise level at the nearest property line of a residence or public building, school, medical, emergency or other public facility, or one hundred feet (100') from the nearest residence or public building, medical, emergency or other public facilities, whichever point is closer to the affected residence or public building, school medical, emergency or other public facility. In lieu of the establishment of the ambient noise level established by the continuous seventy-two (72) hour test the applicant may assume and use, for the purpose of compliance with this ordinance, a default ambient noise level of 55 dBA. The sound level meter used in conducting any evaluation shall meet the American National Standard Institute's standard for sound meters or an instrument and the associated recording and analyzing equipment, which will provide equivalent data.

3. The applicant shall provide the Borough documentation of the established ambient noise level prior to starting oil or gas drilling and/or production operations.

4. The noise generated during the oil and gas operations or the natural gas compressor station or the natural gas processing plant shall not exceed the average ambient noise level established in subsection 2. above by more than:

   a. 5 decibels during drilling activities.
   b. 10 decibels during hydraulic fracturing operations.
   c. 5 decibels for a gas compressor station or a natural gas processing plant.
   d. Allowable increase in subsection c. above shall not exceed the average ambient noise level for more than ten (10) minutes within any one-hour period.

5. Effective sound mitigation devices shall be installed to permanent facilities to address sound levels that would otherwise exceed the noise level standards when located near a residence, public building, school, medical, emergency or other public facilities.

6. Exemption from the standards established in this subsection may be granted by the Borough during the drilling stage or at the oil or gas well site, or the gas compressor station, or at the natural gas processing plant for good cause shown and upon written agreement between the applicant and the Borough.

7. Complaints received by the Borough shall be addressed by the applicant, within 24 hours following receipt of notification by continuously monitoring for a period of forty-eight hours at the nearest property line to the complainant's residential or public building or one-hundred feet from the complainant's residential or public building, school medical, emergency or other public facilities, whichever is closer. The applicant shall report the findings to the Borough and shall mitigate the problem to the allowable level if the noise level exceeds the allowable rate.

8.     Natural gas compressor stations and natural gas processing plants or facilities performing the equivalent functions shall be constructed so as to mitigate sound levels, or have installed mitigation devices to mitigate sound levels that would otherwise exceed the ambient noise level standards at residential or public buildings, medical, emergency or other public facilities.

G.    *Prohibitions*

1.     No drilling shall be allowed in the floodway designated as such in the Flood Insurance Study (FIS) and shown on the Federal Emergency Management Agency (FEMA) maps.

2.     No drilling shall be allowed in the 100-year flood plain as shown on the Federal Emergency Management Agency (FEMA) maps.

# ARTICLE IX-B

## MEDICAL MARIJUANA FACILITIES

### 901-B  PURPOSE

The purpose of this article is to establish a process and standards for the establishment, construction, and operations of medical marijuana facilities, pursuant to the Pennsylvania "Medical Marijuana Act" (PA Act 16, 2016) to allow for the integration of an allowed industry while providing for the protection of the public's health, safety, morals, and general welfare.

### 902-B  DISTRICT REGULATIONS

A.   Academic Clinical Research Centers are permitted in the M-1 and M-2 zone districts with consideration for the applicable performance standards found in this Article IX-B.

B.   Medical Marijuana Grower/Processors are permitted in the M-1 and M-2 zone districts with consideration for the applicable performance standards found in this Article IX-B.

C.   Medical Marijuana Transport Vehicle Offices are permitted in the M-1 and M-2 zone district, with consideration for the applicable performance standards found in this Article IX-B.

D.   Medical Marijuana Dispensaries are permitted in the M-1 zone district, with consideration for the applicable performance standards found in this Article IX-B.

### 903-B  DEFINITIONS

A.   **Academic Clinical Research Center** – An accredited medical school within this Commonwealth that operates or partners with an acute care hospital licensed within this Commonwealth.

B.   **Caregiver** - The individual designated by a patient to deliver medical marijuana.

C.   **Certified Medical Use** – The acquisition, possession, use, or transportation of medical marijuana by a patient, or the acquisition, possession, delivery, transportation or administration of medical marijuana by a caregiver, for use as part of the treatment of the patient's serious medical condition, as authorized by certification by the Commonwealth.

D.   **Clinical Registrant** -  An entity that:

1.   Holds a permit both as a grower/processor and a dispensary; and

2.   Has a contractual relationship with an academic clinical research center under which the academic clinical research center or its affiliate provides advice to the entity, regarding, among other areas, patient health and safety, medical applications and dispensing and management of controlled substances.

E.   **Dispensary** - A person, including a natural person, corporation, partnership, association, trust or other entity, or any combination thereof, which holds a permit issued by  the Department  of  Health  (DOH)  of  the  Commonwealth  to  dispense  medical marijuana.

F.   **Form of Medical Marijuana** - The characteristics of the medical marijuana recommended or limited for a particular patient, including the method of consumption and any particular dosage, strain, variety and quantity or percentage of medical marijuana or particular active ingredient.

G.   **Grower/Processor** - A person, including a natural person, corporation, partnership, association, trust or other entity, or any combination thereof, which holds a permit from the DOH to grow and process medical marijuana.

H.   **Identification Card** - A document issued by the DOH that permits access to medical marijuana.

I.   **Medical Marijuana** - Marijuana for certified medical use as legally permitted by the Commonwealth of Pennsylvania with Act 16.

J.   **Medical Marijuana Organization or Facility** - A dispensary or a grower/processor of marijuana for medical purposes.

K.   **Medical Marijuana Delivery Vehicle Office** - Any facility used to house delivery vehicles for supplying marijuana plants or seeds to one or more marijuana grower/processors and/or dispensaries.

L.   **Registry** - The registry established by the DOH for all medical marijuana organizations and practitioners.

## 904-B   <u>USE REGULATIONS</u>

A.   ACADEMIC CLINICAL RESEARCH CENTERS

1.   Parking requirements will following the parking schedule found in Article X of this Ordinance as listed for trade and technical schools.

2.   An academic clinical research center may only grow medical marijuana in an indoor, enclosed, and secure building which includes electronic locking systems, electronic surveillance and other features required by the DOH. The grower/processor facility shall not be located in a trailer, cargo container, mobile or modular unit, mobile home, recreational vehicle or other motor vehicle.

3.   All external lighting serving an academic clinical research center must be shielded in such a manner to not allow light to be emitted skyward or onto adjoining properties as established in Article XIII.

4.   A ten-foot-wide (10') evergreen buffer strip shall be provided and maintained along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

B.   MEDICAL MARIJUANA GROWER/PROCESSOR

1.   A medical marijuana grower/processor may only grow medical marijuana in an indoor, enclosed, and secure building which includes electronic locking systems, electronic surveillance and other features required by the DOH. The grower/processor facility shall not be located in a trailer, cargo container, mobile or modular unit, mobile home, recreational vehicle or other motor vehicle.

2. The floor area of a medical marijuana grower/processor shall include sufficient space for production, secure storage of marijuana seed, related finished product cultivation, and marijuana related materials and equipment used in production and cultivation or for required laboratory testing.

3. There shall be no emission of dust, fumes, vapors, odors, or waste into the environment from any facility where medical marijuana growing, processing or testing occurs.

4. Marijuana remnants and byproducts shall be secured and properly disposed of in accordance with the DOH Policy and shall not be placed within any unsecure exterior refuse containers.

5. The grower/processor shall provide only wholesale products to other medical marijuana facilities. Retail sales and dispensing of medical marijuana and related products is prohibited at medical marijuana grower/processor facilities.

6. Growers/processors may not locate within 1,000 feet of the property line of a public or private school or child day-care center.

7. All external lighting serving a medical marijuana grower/processor must be shielded in such a manner to not allow light to be emitted skyward or onto adjoining properties as regulated in Article XIII of this Ordinance.

8. Parking requirements shall follow the parking schedule found in Article X for Light Industry land-uses.

9. A ten-foot-wide (10') evergreen buffer strip shall be provided and maintained along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

10. Entrances and driveways to a medical marijuana grower/processor must be designed to accommodate the anticipated vehicles used to service the facility.

    a. All accesses must secure the appropriate highway occupancy permit (State, County or Borough).

11. Loading and off-loading areas within the structure are preferred. If an external loading dock arrangement is designed it should be from within a secure environment.

C. MEDICAL MARIJUANA TRANSPORT VEHICLE SERVICE

1. A traffic impact study is required where the office is operated.

2. Parking requirements will follow the parking schedule found in Article X of this Ordinance for transit-related businesses.

3. All external lighting serving a medical marijuana transport vehicle service must be shielded in such a manner to not allow light to be emitted skyward or onto adjoining properties as regulated in Article XIII of this Ordinance.

4. A ten-foot-wide (10') evergreen buffer strip shall be provided and maintained along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

5. Entrances and driveways to a medical marijuana transport vehicle service must be designed to accommodate the anticipated vehicles used to service the facility.

   a. All accesses must secure the appropriate highway occupancy permit (State, County or Borough).

6. If for some reason a medical marijuana product is to be temporarily stored at a medical marijuana transport vehicle service facility, the facility must be secured to the same level as a medical marijuana grower/producer and dispensary.

7. Loading and off-loading areas within the structure are preferred. If an external loading dock arrangement is designed it should be from within a secure environment.

D. MEDICAL MARIJUANA DISPENSARY

1. A medical marijuana dispensary must be legally registered in the Commonwealth and possess a current valid medical marijuana permit from the DOH.

2. A medical marijuana dispensary may only dispense medical marijuana in an indoor, enclosed, permanent, and secure building and shall not be located in a trailer, cargo container, mobile or modular unit, mobile home, recreational vehicle or other motor vehicle.

3. A medical marijuana dispensary may not operate on the same site as a facility used for growing and processing medical marijuana.

4. Medical marijuana dispensaries shall have a single secure public entrance and shall implement appropriate security measures to deter and prevent the theft of marijuana and unauthorized entrance into areas containing medical marijuana.

5. Permitted hours of operation of a dispensary shall be 8 am to 8 pm of the same calendar day.

6. A medical marijuana dispensary shall be a maximum of 3,000 gross square feet, of which no more than 500 square feet shall be used for secure storage of product, and shall have an interior customer waiting area equal to a minimum of twenty-five (25) percent of the gross floor area.

7. A medical marijuana dispensary shall:

   a. Not have a drive-through service;
   b. Not have outdoor seating areas;
   c. Not have outdoor vending machines;
   d. Prohibit the administering of, or the consumption of medical marijuana on the premises; and
   e. Not offer direct or home delivery service.

8. A medical marijuana dispensary may dispense only medical marijuana to certified patients and caregivers and shall comply with all lawful, applicable health regulations.

9. A medical marijuana dispensary may not be located within 1,000 feet of the property line of a public or private school or a child day-care center. This distance shall be measured in a straight line from the closest exterior wall of the building or portion thereof in which the business is conducted or proposed to be conducted, to the closest property line of the protected use, regardless of municipality in which it is located.

10. A medical marijuana dispensary shall be a minimum distance of 1,000 feet from the next nearest medical marijuana facility. This does not include complementing or supporting businesses covered by different definitions. This distance shall be measured in a straight line from the closest exterior walls of the buildings or portions thereof in which the businesses are conducted or proposed to be conducted, regardless of municipality in which it is located. This separation distance does not apply to the distance between the grower/processor or academic clinical research centers and the specific dispensary they serve, or with which they partner.

11. Any medical marijuana facility lawfully operating shall not be rendered in violation of these provisions by the subsequent location of a public, private or parochial school or a day-care center.

12. All external lighting serving a medical marijuana dispensary must be shielded in such a manner to not allow light to be emitted skyward or onto adjoining properties as regulated in Article XIII of this Ordinance.

13. Parking requirements will follow the parking schedule found in Article X of this Ordinance for medical clinics.

14. All external lighting serving a medical marijuana transport vehicle service must be shielded in such a manner to not allow light to be emitted skyward or onto adjoining properties as regulated in Article XIII of this Ordinance.

15. A ten-foot-wide (10') evergreen buffer strip shall be provided and maintained along all side and rear yards that abut any Residential Use as listed in Schedule I and defined by Article III of this Ordinance. The initial height of the evergreen planting shall be five feet (5').

16. Entrances and driveways to a medical marijuana transport vehicle service must be designed to accommodate the anticipated vehicles used to service the facility.

   a. All accesses must secure the appropriate highway occupancy permit (State, County or Borough).

17. Loading and off-loading areas within the structure are preferred. If an external loading dock arrangement is designed it should be from within a secure environment.

## ARTICLE IX-C

## AIRPORT DISTRICT OVERLAY

### 901-C  PURPOSE

The purpose of this article is to create an airport district overlay that considers safety issues around the **Wilkes-Barre/Scranton International Airport**, regulates and restricts the heights of constructed structures and objects of natural growth, creates appropriate zones, establishing the boundaries thereof and providing for changes in the restrictions and boundaries of such zones, creates the permitting process for use within said zones and provides for enforcement, assessment of violation penalties, an appeals process, and judicial review.

### 902-C  RELATION TO OTHER ZONING DISTRICTS

The Airport District Overlay shall not modify the boundaries of any underlying zoning district. Where identified, the Airport District Overlay shall impose certain requirements on land use and construction in addition to those contained in the underlying zoning district.

### 903-C  DEFINITIONS

The following words and phrases when used in this Article IX-B shall have the meaning given to them in this article unless the context clearly indicates otherwise.

**Airport Elevation -** The highest point of an airport's useable landing area measured in feet above sea level. The airport elevation of the **Wilkes-Barre/Scranton International Airport** is 962' above sea level. *(Runway elevation)*

**Airport Hazard -** Any structure or object, natural or manmade, or use of land which obstructs the airspace required for flight or aircraft in landing or taking off at an airport or is otherwise hazardous as defined in 14 CFR Part 77 and 74 Pa. Cons. Stat. §5102.

**Airport Hazard Area -** Any area of land or water upon which an airport hazard might be established if not prevented as provided for in this Ordinance and the Act 164 of 1984 (Pennsylvania Laws Relating to Aviation).

**Approach Surface (Zone) -** An imaginary surface longitudinally centered on the extended runway centerline and extending outward and upward from each end of the primary surface. An approach surface is applied to each end of the runway based on the planned approach. The inner edge of the approach surface is the same width as the primary surface and expands uniformly depending on the planned approach. The approach surface zone, as shown on Figure B, is derived from the approach surface.

**Conical Surface (Zone) -** An imaginary surface extending outward and upward from the periphery of the horizontal surface at a slope of twenty (20) feet horizontally to one (1) foot vertically for a horizontal distance of 4,000 feet. The conical surface zone, as shown on Figure B, is based on the conical surface.

**Department -** Pennsylvania Department of Transportation.

**FAA –** Federal Aviation Administration of the United States Department of Transportation.

**Height –** For the purpose of determining the height limits in all zones set forth in this Ordinance and shown on the zoning map, the datum shall be mean sea level elevation unless otherwise specified.